No. 100,854

STATE OF KANSAS, *Appellee*, v. THEODORE G. BURNETT, *Appellant*.

(270 P.3d 1115)

Opinion filed February 10, 2012.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: A jury convicted Theodore Burnett of capital murder and aggravated kidnapping for his role in the kidnapping and murder of C.B., a pregnant, 14-year-old girl. After the jury was unable to reach a unanimous verdict in the penalty phase of the trial regarding imposition of the death penalty, the sentencing court imposed a life sentence with no possibility of parole on the capital murder conviction. Further, the court imposed a consecutive aggravated presumptive prison sentence of 618 months on the aggravated kidnapping conviction.

In this direct appeal, Burnett argues his convictions must be reversed because the verdict forms used in the penalty phase of the trial did not allow the jury to express fact findings sufficient to constitute an acquittal on the death penalty. Thus, Burnett reasons the verdict forms insufficiently protected his constitutional right to be free from double jeopardy in any future prosecution. Because this claim is not ripe for appellate review, we decline to consider this issue.

Burnett also claims the prosecutor committed reversible misconduct during closing argument by suggesting that Burnett's mere presence during the aggravated kidnapping of C.B. was sufficient to convict him of aiding and abetting the kidnapping. Further, Burnett argues the trial court erred in admitting autopsy photographs that Burnett claims were more prejudicial than probative and in instructing the jury that another trial would be a burden on both sides. Finding no reversible trial errors, we affirm Burnett's convictions.

Finally, Burnett contends the sentencing court violated his constitutional rights when it imposed an aggravated presumptive sentence for the kidnapping conviction. Because we lack jurisdiction

to review the imposition of a presumptive sentence, we dismiss that portion of Burnett's appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of June 9, 2006, C.B. went to a skating rink in Wichita with her friends, A.K. and M.D. At the time, C.B. was 14 years old and 9 months pregnant with Elgin Ray Robinson, Jr.'s child. At some point, C.B. left the skating rink with Robinson's friend, Everett Gentry, and told her friends that Gentry would take her to meet Robinson. C.B. never returned to the skating rink.

On June 15, 2006, C.B.'s body was discovered near a field in Butler County, buried face down in a shallow grave. Homicide detectives quickly focused their investigation on Gentry and Robinson, who both initially denied involvement in C.B.'s murder. Ultimately, Gentry implicated himself, Burnett, and Robinson in the murder.

The State charged Burnett with capital murder, in violation of K.S.A. 21-3439(a)(2) (intentional and premeditated killing pursuant to a contract or agreement), an off-grid person felony; and aggravated kidnapping, in violation of K.S.A. 21-3421, (kidnapping by deception with intent to inflict bodily injury, see K.S.A. 21-3420[c]), a severity level 1 person felony.

At trial, Gentry testified for the State, providing the primary evidence implicating Burnett in C.B.'s murder and kidnapping. Gentry's testimony is summarized below.

*Gentry's trial testimony*

Several months before C.B.'s murder, Robinson told Gentry that he needed to get rid of C.B. because her parents intended to seek rape charges against Robinson after C.B.'s child was born and Robinson's paternity was established. Robinson offered Gentry $1,000 if Gentry would assist Robinson in carrying out C.B.'s murder. Gentry agreed to assist.

As Gentry and Robinson planned C.B.'s kidnapping and murder, Gentry believed Robinson would kill C.B. But a few weeks before the murder, Gentry and Robinson decided Robinson should be out of town when the murder occurred so that suspicion did not focus

on Robinson. However, Gentry was unwilling to perform the act of killing C.B., so the two men discussed bringing in a third party.

In the two months preceding C.B.'s murder, Burnett had allowed Gentry to sell crack cocaine out of Burnett's apartment in exchange for Gentry providing Burnett with crack cocaine for his personal use. Gentry eventually approached Burnett to assist him in murdering C.B., telling Burnett that Gentry had a "friend" who wanted someone murdered and was willing to pay someone to carry out the murder. Gentry offered to pay Burnett $500 if he would help him with the murder. Burnett "[p]retty much agreed to it."

A few days before the murder, Gentry and Burnett dug a shallow hole near a city golf course, anticipating that they would place C.B.'s body there after her murder. But Burnett suggested the area was too populated, making it risky to bury a body there. So on the day of C.B.'s murder, Gentry drove alone to another potential burial site outside of Andover that he and Robinson had selected, and Gentry dug a shallow grave. That evening, after receiving a text message from Robinson, Gentry picked up C.B. from the skating rink, took her to his sister's house, told C.B. that Robinson was on his way, and left to pick up Burnett at his apartment. A few minutes later, Gentry returned with Burnett to the house where C.B. was waiting.

Burnett was surprised that the intended victim was a "pregnant girl," and he told Gentry he needed to smoke some crack cocaine to calm his nerves before carrying out the murder. So Gentry and Burnett left C.B. at the house and drove to a nearby Walgreens store where Gentry purchased several items, including ground coffee and a flashlight to be used at the burial site. The two men then returned to Burnett's apartment where Burnett smoked crack. As they left the apartment, Burnett grabbed some latex gloves from a dresser drawer in the living room along with a cord used to attach electronics to a television. When Gentry and Burnett returned to the house where C.B. waited, C.B. had spoken with Robinson and realized he would not be meeting her. Gentry agreed to take C.B. back to the skating rink, but told her he would first take Burnett home.

As Gentry, Burnett, and C.B. got into Gentry's car, C.B. attempted to sit in the back seat, but Burnett insisted she sit in the front. As Gentry drove toward the shallow grave he had dug in Andover, Burnett acted as though Burnett "was going to get dropped off" and pretended to give Gentry directions to his apartment.

After Gentry turned onto a dirt road leading to the grave site, he reached into the back seat and tapped Burnett on the knee, signaling him it was time to kill C.B. When Burnett hesitated, Gentry tapped his knee a second time. Wearing latex gloves, Burnett then placed the cord over C.B.'s head and yanked it forcefully against her neck, placing his foot on the back of the passenger seat for additional leverage. C.B. struggled for approximately 2 minutes before her body went limp.

Gentry stopped his car near the prepared grave, and the two men pulled C.B.'s body out of the car and laid it in the grass. Because C.B. continued to make "a snoring sound," Burnett placed plastic Walgreens bags over her head. Gentry and Burnett then placed C.B.'s body face down in the grave, covered her with dirt, and began the drive back to Wichita.

However, Gentry missed a turn, and they ended up in Rose Hill. As they turned around, Gentry noticed that the cell phone C.B. had been using was on the passenger-side floor. Burnett picked up the phone, wiped it off, and threw it out the car window, breaking the phone into pieces. After they returned to Wichita, Gentry dropped Burnett at his apartment but returned later that night to give Burnett $200 in cash and $150 worth of crack cocaine for Burnett's part in C.B.'s murder.

*Other corroborating evidence*

The State presented evidence at trial corroborating several key aspects of Gentry's testimony. C.B.'s friends, A.K. and M.D., testified that C.B. sent them text messages on the night of the murder informing them that she left the skating rink with Gentry, that she waited for Robinson at Gentry's apartment, and that Gentry would bring her back to the skating rink after he dropped off a friend. A.K. and M.D. attempted to call C.B. after her last message at 9:30

p.m. but the phone went to voice mail, indicating to them that C.B.'s phone either was turned off or the battery was dead.

The State also presented testimony that C.B.'s body was discovered on June 15, 2006, buried face down in a shallow grave near a field in Butler County. A Playstation cord was wrapped around her neck and two plastic Walgreens bags had been placed over her head. The medical examiner testified C.B. died from ligature strangulation and that the pressure marks on C.B.'s neck were consistent with being strangled from behind.

Crime scene investigator Gregory Burge testified that during a search of Burnett's apartment, officers found a coaxial cable in the top drawer of a large dresser in the living room and latex gloves in the bedroom and bathroom. The cell phone C.B. used on the night she disappeared was found, broken, in a ditch on the side of Rose Hill Road.

Detective Timothy Relph testified that in March 2008, Gentry showed Relph and Lieutenant Kenneth Landwehr the hole he and Burnett dug near the city golf course on the day of the murder. Gentry also identified himself in a surveillance video taken on the night of the murder from the Walgreens store where Burnett and Gentry stopped.

Finally, through investigator Dana Gouge, the State presented testimony analyzing the cell phone calls and messages made and received by Gentry, C.B., and Robinson on the day of C.B.'s murder. The records showed that Gentry and Robinson communicated with each other throughout the afternoon and evening, as did C.B. and Robinson. Further, both Gentry's and C.B.'s communications near the time of the murder were transmitted through cell phone towers near Andover.

The jury found Burnett guilty as charged. Following the penalty phase of the trial, the jury was unable to reach a unanimous verdict regarding imposition of the death penalty. The sentencing court imposed a life sentence without the possibility of parole on the capital murder conviction and a consecutive aggravated presumptive prison sentence of 618 months on the aggravated kidnapping conviction.

## DISCUSSION

*Burnett's challenge to the jury verdict forms is not ripe for appellate review.*

In this direct appeal of his convictions and sentences, Burnett first challenges the jury verdict forms utilized in the trial's penalty phase, claiming the forms did not adequately protect his right to be free from double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution and interpreted by *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003). Burnett concedes he did not object to the verdict forms at trial, but argues the forms are clearly erroneous because they did not allow the jury to express fact findings sufficient to constitute an acquittal on the death penalty.

When a party fails to object to the giving of a jury instruction that is then challenged on appeal, we apply a clearly erroneous standard of review. K.S.A. 22-3414(3); *State v. Martinez*, 288 Kan. 443, 451, 204 P.3d 601 (2009). That standard applies equally to jury verdict forms. *Unruh v. Purina Mills*, 289 Kan. 1185, 1197-98, 221 P.3d 1130 (2009). "An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *Martinez*, 288 Kan. at 451-52.

To the extent resolution of this issue requires interpretation of the capital sentencing statutes or application of caselaw, our review is unlimited. See *State v. Gracey*, 288 Kan. 252, 257, 200 P.3d 1275 (2009) (interpretation of a sentencing statute is a question of law subject to unlimited review); *NEA-Coffeyville v. USD No. 445*, 268 Kan. 384, 386, 996 P.2d 821 (2000) (interpretation of caselaw is subject to unlimited review).

The Fifth Amendment to the United States Constitution provides, in part, that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." The United States Supreme Court has explained that

"the language of the Double Jeopardy Clause protects against more than the actual imposition of two punishments for the same offense; by its terms, it protects a criminal defendant from being *twice put in jeopardy* for such punishment. See *Price v. Georgia*, 398 U.S. 323[, 326, 90 S. Ct. 1757, 26 L. Ed. 2d 300] (1970).

That is, the Double Jeopardy Clause 'prohibits merely punishing twice, *or attempting a second time to punish criminally*, for the same offense.' *Helvering v. Mitchell*, 303 U.S. 391, 399[, 58 S. Ct. 630, 82 L. Ed. 917] (1938) (emphasis added)." *Witte v. United States*, 515 U.S. 389, 396, 115 S. Ct. 2199, 132 L. Ed. 2d 351 (1995).

As Burnett points out, the Fifth Amendment double jeopardy protection has been applied to the penalty phase of a capital trial. See *Sattazahn*, 537 U.S. at 106-10. Here, in the penalty phase of the trial, the jury was given two verdict forms. The first form provided:

"We the jury, impaneled and sworn, do upon our oath or affirmation, unanimously find beyond a reasonable doubt that the following aggravating circumstances have been established by the evidence and do outweigh mitigating circumstances found to exist (the Presiding Juror shall place an X in the square in front of such aggravating circumstance(s))."

The verdict form then listed the aggravating factors. The alternative verdict form provided: "We, the jury, impaneled and sworn, do upon our oath or affirmation, state that we are unable to reach a unanimous verdict sentencing the defendant to death."

The jury also was instructed as follows in Instruction No. 6:

"If you find unanimously beyond a reasonable doubt that there are one or more aggravating circumstances and that they are not outweighed by any mitigating circumstances found to exist, then you shall impose a sentence of death. If you sentence the defendant to death, you must designate upon the appropriate verdict form with particularity the aggravating circumstances which you unanimously found beyond a reasonable doubt."

Instruction No. 6 further provided:

"[I]f one or more jurors is not persuaded beyond a reasonable doubt that there are one or more aggravating circumstances and that they are not outweighed by any mitigating circumstances found to exist, then you should sign the appropriate alternative verdict form indicating the jury is unable to reach a unanimous verdict sentencing the defendant to death."

In this case, the jurors left the first verdict form blank and signed the second verdict form, indicating they were unable to reach a unanimous verdict. Burnett now argues that the verdict form violated his double jeopardy protection because:

"Nowhere was the jury given the option to express unanimous agreement that death was not the proper verdict because the [S]tate had failed to prove the aggravators outweighed the mitigators. More importantly, the jury also did not have the option to find that the [S]tate had failed to prove an aggravating factor beyond a reasonable doubt."

Burnett's appeal argument overlooks a fundamental aspect of the Double Jeopardy Clause—*i.e.*, it prohibits *"punishing twice, or attempting a second time to punish criminally"* for the same offense. *Witte,* 515 U.S. at 396. Burnett has not been punished twice, nor has the State *attempted* to punish Burnett twice for the same offense. Thus, any consideration by this court of Burnett's double jeopardy argument is premature.

Burnett fails to cite to any case in which a court has considered a double jeopardy issue before the defendant was punished twice for the same offense or the State at least attempted to punish the defendant twice for the same offense. Moreover, the only case cited by Burnett in his brief, *Sattazahn v. Pennsylvania,* 537 U.S. 101, does not support our consideration of his double jeopardy claim at this juncture. There, the jury initially convicted the defendant of first-degree murder but became deadlocked during the penalty phase, and the trial court imposed a life sentence as required by statute. After the defendant's conviction was reversed on appeal, the State retried him, and the jury convicted him of first-degree murder and returned a verdict imposing the death penalty.

Sattazahn appealed the death penalty verdict, arguing the verdict was barred by the Double Jeopardy Clause because the first jury acquitted him of the death penalty. But the United States Supreme Court disagreed, finding no double jeopardy violation because the first jury became deadlocked during the penalty phase and did not acquit the defendant. *Sattazahn,* 537 U.S. at 106-10.

Sattazahn raised the double jeopardy issue after he was retried and the jury returned a verdict imposing the death penalty on retrial. But we need not determine whether *Sattazahn* supports or undercuts Burnett's double jeopardy argument here because Burnett's conviction has not been overturned and he has not been retried. Moreover, the State has not even *attempted* to punish Burnett twice for the same offense. See *Witte,* 515 U.S. at 393-97

(defendant's double jeopardy claim was ripe even though defendant had been charged but not yet convicted in the second case because the present case constituted a second attempt to punish him criminally for drug offenses of which he had been previously convicted).

Essentially, Burnett seeks an advisory opinion prohibiting the State from seeking the death penalty in some future case if his conviction and sentence in this case is ever overturned. We lack authority to render such an opinion as Burnett's claim is not ripe for appellate review. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 892, 179 P.3d 366 (2008) ("To be ripe, issues must have taken shape and be concrete rather than hypothetical and abstract."). Thus, we reject Burnett's first claim of error.

*The prosecutor did not commit misconduct during closing argument.*

Burnett next argues that the prosecutor improperly suggested in closing argument that Burnett's mere presence in the car when Gentry kidnapped C.B. permitted the jury to find him guilty of aggravated kidnapping on a theory of aiding and abetting.

In reviewing allegations of prosecutorial misconduct, we first determine whether the prosecutor's comments were outside the wide latitude allowed the prosecutor in discussing the evidence. If so, we then consider whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009).

When a prosecutor deliberately misstates the controlling law, he or she steps outside the considerable latitude given prosecutors. *State v. Gunby*, 282 Kan. 39, 63-64, 144 P.3d 647 (2006). However, even a misstatement of the law does not require reversal if it does not constitute plain error. See 282 Kan. at 65 (finding prosecutor's misstatement regarding premeditation improper but not reversible).

Burnett challenges the prosecutor's comment in closing argument:

"Who took [C.B.]? Everett [Gentry] did. Everett picked her up, Everett drove the car. Ted Burnett sat in the back seat, so he aided and abetted the taking, the kidnapping. That's why the aid and abet instruction is in there, as well. He wasn't driving the car, someone else was the principle [sic] in that part of the act, in the taking of [C.B.]. That's why there's an aiding and abetting instruction that's a part of aggravated kidnapping."

Burnett points out that this court has held that a defendant's mere presence in the vicinity of a crime or mere association with the principals that commit a crime is insufficient to establish guilt as an aider or abettor. See *State v. Baker*, 287 Kan. 345, 366, 197 P.3d 421 (2008). He argues that when the prosecutor made the above comment, he effectively advised the jury that the defendant was guilty of kidnapping regardless of whether he was aware of or participated in the deception.

Burnett's argument is flawed in that it isolates the prosecutor's remark, ignoring the prosecutor's further argument and the instructions given to the jury regarding aiding and abetting. But we must consider the challenged statements in the context of the entire closing argument and in conjunction with the instructions given at trial. See *Baker*, 287 Kan. at 366-68 (reviewing prosecutor's alleged misstatement of the law in context of entire closing argument and instructions given to jury).

Just before the prosecutor made the statement to which Burnett now objects, he discussed the instructions given to the jury along with the evidence supporting the elements of the charges, including aggravated kidnapping. The prosecutor stated:

"[Aggravated] kidnapping is the second count, aggravated kidnapping. We have to prove that the defendant took or confined [C.B.] by deception, force or threat. I'll tell you right now, there's no evidence of force or threat, that's just what the statute—how it reads. *She was taken by deception, she thought she was going to see Ray. And then when she got in the car the second time, she thought she was going to be taken home after the friend was dropped off. She was deceived; otherwise, she wouldn't have gotten in the car.*

"That this was done with the intent to hold [C.B.], to inflict bodily injury upon her. Death. What more deadly injury can there be? That's why they picked her up. That's why they took her. That bodily harm was indeed inflicted upon [C.B.]. Again is there any doubt that bodily harm was inflicted upon this child?

"The acts occurred, again, on the dates alleged. And for good measure, again, we have the venue statute that's imposed in the instructions. There's one other

thing, it's the aiding and abetting statute, it's also part of the [aggravated] kidnapping." (Emphasis added.)

Thus, when the prosecutor referenced Burnett's presence in the car, he did so to explain the distinction between being a principal to a crime and aiding and abetting a crime. He did not suggest that Burnett *only* participated in the aggravated kidnapping by sitting in the car. Nor did the prosecutor suggest, as Burnett argues, that Burnett could be convicted of aiding and abetting absent proof of knowledge of the deception that formed the basis for the charge of aggravated kidnapping.

Further, at the close of evidence, the court properly instructed the jury regarding the elements of aggravated kidnapping and the principle of aiding and abetting. Additionally, we note that after deliberations began, the jury requested a definition of "aiding or abetting." The trial court conferred with both parties and provided the following agreed upon response:

"Insofar as it pertains to instruct[ion] number 15, the elements instruction for count two, a person who either before or during its commission, intentionally aids or abets another to commit a crime, with the intent to promote or assist in its commission, is criminally responsible for the crime committed, regardless of the extent of the defendant's participation, if any, in the actual commission of the crime. I further answer that common words are given their common meaning."

The court's response to the jury's inquiry was consistent with the law regarding aiding and abetting. See K.S.A. 21-3205(1) ("A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime."); see also *Baker*, 287 Kan. at 366 (to establish guilt on the basis of aiding and abetting, the State must show that a defendant knowingly associated with the unlawful venture and participated in such a way as to indicate he or she was facilitating the success of the venture).

Under these circumstances, we agree with the State that the prosecutor did not misstate, deliberately or otherwise, the law on aiding and abetting. Because we have determined the prosecutor committed no misconduct, we need not address the second step of the prosecutorial misconduct analysis, and we reject Burnett's second claim of error.

*The trial court did not abuse its discretion in admitting two autopsy photographs.*

Next, Burnett contends that because the cause and manner of C.B.'s death were not disputed, the trial court abused its discretion by admitting multiple gruesome and repetitious photographs of C.B. Although Burnett objected at trial to the admission of several photographs, on appeal he challenges the admission of only two autopsy photographs, Exhibits 144 and 145.

In considering the admission of photographic evidence, we must first determine whether the photos are relevant. And if, as here, the defendant argues the photographs were overly repetitious, gruesome, or inflammatory, we review the admission of the photographs for an abuse of discretion. See *State v. Riojas*, 288 Kan. 379, 387, 204 P.3d 578 (2009).

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2010]).

The party asserting an abuse of discretion bears the burden of showing such an abuse of discretion. *State v. Woodward*, 288 Kan. 297, 299, 202 P.3d 15 (2009).

As noted, our first task is to determine whether the photographs are relevant. See *Riojas*, 288 Kan. at 387. Generally, all relevant evidence is admissible. K.S.A. 60-407(f). More specifically, we have established the following principles regarding the relevancy of photographs in a homicide case:

" ' "Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. [Citation omitted.] Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. [Citation omitted.] Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible. [Citation omitted.]" ' " *State v. Parker*, 277 Kan. 838, 847, 89 P.3d 622 (2004) (quoting *State v. Green*, 274 Kan. 145, 147, 48 P.3d 1276 [2002]).

Additionally, because the State has the burden to prove every element of the crime charged, photographs used to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant even if the cause of death is not contested. *Riojas*, 288 Kan. at 387. Finally, while we have stated that the " 'wholesale admission of similar grotesque and bloody photographs which add nothing new to the state's case' is improper," a photograph need not be excluded simply because it is gruesome. *State v. Hernandez*, 284 Kan. 74, 99, 159 P.3d 950, *cert. denied* 552 U.S. 1025 (2007) (quoting *State v. Clark*, 218 Kan. 18, 24, 542 P.2d 291 [1975]).

Here, we agree with the State that the district court did not abuse its discretion in admitting Exhibits 144 and 145. The medical examiner, Dr. Mary Dudley, testified C.B. died from ligature strangulation. Dudley based her conclusion on the ligature found tightly wrapped around C.B.'s neck, the petechial hemorrhage in her eye, and the hemorrhaging in the strap muscles of her neck. Dudley identified Exhibit 144 as a photograph of C.B.'s eye and pointed out the petechial hemorrhage in the eye. Dudley then identified Exhibit 145 as a close-up of C.B.'s chin, neck, and chest region, and she pointed out the pressure abrasion from the ligature. Although gruesome, these photographs clearly were relevant and admissible to assist the medical examiner in explaining her testimony. Accordingly, we reject Burnett's third claim of error.

*The district court's instructional error does not require reversal.*

Next, Burnett claims he is entitled to a new trial because before deliberations began, the trial court gave the jury an *Allen* instruction that included the phrase "[a]nother trial would be a burden on both sides." See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). Burnett admits he did not object to this instruction, but argues the trial court clearly erred in giving the instruction in light of *State v. Salts*, 288 Kan. 263, 200 P.3d 464 (2009). The State acknowledges that this court in *Salts* disapproved the same language challenged here. Nevertheless, the State argues the instruction was not clearly erroneous.

When a party fails to object to the giving of a jury instruction, we apply a clearly erroneous standard of review. K.S.A. 22-3414(3); *Martinez*, 288 Kan. at 451. "An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." 288 Kan. at 451-52.

Because we have held that the phrase "[a]nother trial would be a burden on both sides" is both misleading and inaccurate, we conclude the district court erred in giving an instruction containing the challenged language in this case. See *Salts*, 288 Kan. at 266-67; *State v. Page*, 41 Kan. App. 2d 584, 586-87, 203 P.3d 1277 (2009). However, here, as in *Salts*, the court gave the erroneous instruction prior to jury deliberations, and Burnett failed to object to the instruction at trial. See *Salts*, 288 Kan. at 264-65. Accordingly, reversal is required only if we are firmly convinced there is a real possibility the jury would have rendered a different verdict had the instructional error not occurred. *Salts*, 288 Kan. at 265-66.

Burnett urges us to find clear error because here, unlike in *Salts*, the defendant faced a capital murder charge. Burnett speculates that the jury was "likely to be very mindful of the increased litigation costs that go along with capital trials" and that the erroneous instruction "surely invoked concerns that a failure to reach a verdict would waste taxpayer money."

As the State points out, Burnett fails to cite anything in the record to support his assertion that the verdict in this case was the product of the jury's concerns about wasting taxpayer money.

Instead, the record demonstrates the jury heard several days of testimony and the trial court fully and properly instructed the jury on the State's burden of proof and the elements of each of the crimes charged. During deliberation, the jury sought and received clarification on two issues, neither of which indicated the jury was deadlocked or felt pressured to reach a verdict.

Under these circumstances, we conclude it is highly unlikely the jury would have returned different verdicts had the instructional error not occurred. Thus, the *Allen* instruction was not clearly erroneous and reversal is not required.

*Burnett is not entitled to a new trial based on the cumulative effect of trial errors.*

Burnett contends that even if the above alleged errors are deemed harmless when viewed individually, the cumulative effect of trial errors deprived him of his right to a fair trial as guaranteed by the Fourteenth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. The State contends the cumulative error doctrine is inapplicable because Burnett failed to establish multiple trial errors.

We agree with the State. We have found only one trial error—an instructional error that does not require reversal under the facts of the case. Accordingly, Burnett is not entitled to relief under the cumulative error doctrine. See *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009) (the cumulative error doctrine "does not apply if no error or only one error supports reversal").

*We have no jurisdiction to review Burnett's presumptive sentence.*

Finally, Burnett claims the sentencing court violated his Sixth and Fourteenth Amendment rights as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), when it imposed an aggravated presumptive sentence for his kidnapping conviction without requiring that aggravating factors be charged in the complaint and proven to a jury beyond a reasonable doubt. Burnett acknowledges we rejected this argument in *State v. Johnson*, 286 Kan. 824, Syl. ¶ 5, 190 P.3d 207 (2008), but contends *Johnson* was wrongly decided.

Because Burnett received a presumptive sentence, we have no jurisdiction to address his sentencing challenges. See K.S.A. 21-4721(c)(1); *Johnson*, 286 Kan. at 851-52. Accordingly, we must dismiss this portion of Burnett's appeal. See 286 Kan. at 841 (an appeal must be dismissed where the record demonstrates a lack of appellate jurisdiction).

Burnett also claims the sentencing court violated his Sixth and Fourteenth Amendment rights as interpreted by *Apprendi* when it considered his criminal history score to impose the presumptive

sentence without requiring that the facts of his prior convictions be charged in the complaint and proven to a jury beyond a reasonable doubt. Burnett acknowledges this issue is controlled by our decision in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002), but he urges us to reconsider *Ivory* in light of Justice Thomas' concurring opinion in *Shepard v. United States*, 544 U.S. 13, 26-28, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005) (Thomas, J., concurring). We reject Burnett's claims in light of our prior decisions reaffirming *Ivory*. See, *e.g.*, *State v. Brinklow*, 288 Kan. 39, 54-55, 200 P.3d 1225 (2009).

Affirmed in part and dismissed in part.