NOT DESIGNATED FOR PUBLICATION

No. 108,951

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHARLES D. FISHER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOSEPH BRIBIESCA, judge. Opinion filed January 22, 2016. Affirmed in part, vacated in part, and remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., HILL and STANDRIDGE, JJ.

*Per Curiam*: Charles D. Fisher appeals from his conviction and sentence for one count of attempted rape. He raises the following issues on appeal: (1) the evidence was insufficient to support his conviction, (2) the prosecutor's comments during closing argument deprived him of a fair trial, and (3) the district court improperly classified a prior burglary adjudication and a prior burglary conviction as person felonies when calculating his criminal history prior to sentencing.

1

On September 9, 2011, I.E.R. called the Wichita Police Department to report that Fisher, her fiancé, had stolen money from her and attacked her. Law enforcement later interviewed I.E.R., who reported that on September 7, 2 days earlier, she had confronted Fisher for using her debit card to withdraw money out of her bank account. After Fisher admitted to I.E.R. that he had withdrawn the money without her permission, she gave him until the following day to repay her. I.E.R. then told Fisher that she wanted him out of her house and that she was breaking up with him.

I.E.R. reported that, at this point, Fisher became upset, accused her of cheating on him, and stated that he felt like he could kill her. Fisher asked if he could have sex with I.E.R. When she refused, Fisher told her that if she would not "give it up," he would "take it." I.E.R. said Fisher then picked her up and carried and/or drug her to the bedroom, where he threw her on the bed and climbed on top of her. Fisher held I.E.R. down by pinning her arms above her head by her wrists and took off her pants and underwear. I.E.R. said that the zipper on her pants broke as Fisher removed them. I.E.R. reported she tried to keep her legs together, but Fisher used his knee to spread her legs apart. She also reported she fought Fisher and told him "no" the whole time. Nevertheless, Fisher pulled his pants and underwear down and then partially penetrated her vagina with his penis. I.E.R. did not think that Fisher ejaculated or that he wore a condom. I.E.R. said Fisher also pushed her shirt and bra up and fondled and bit her left breast, leaving a bruise. Fisher eventually stopped the attack, after which he fell asleep.

I.E.R. categorically denied any desire to have sex with Fisher that night. Law enforcement observed that I.E.R. had mild bruising on her breast, arms, and on the inside of her right thigh. Law enforcement later recovered I.E.R.'s pants with the broken zipper from a trash can in her apartment. A sexual assault examination of I.E.R. revealed no

injuries to her genital area, but there was bruising on both arms, her right inner thigh, left side of her back, her left breast, and a bite mark on her right breast.

After being advised of his *Miranda* rights, Fisher agreed to speak with law enforcement. Fisher's account of his interaction with I.E.R. was very different than I.E.R.'s account set forth above. Specifically, Fisher said that on September 7, he and I.E.R. argued about a message on I.E.R.'s phone from her ex-boyfriend. Fisher said that when they went to bed, he wanted to have sex but I.E.R. did not want to. Notwithstanding her lack of consent, he admitted he laid on top of I.E.R. and grabbed her shirt while they "tussled" on the bed, both fully clothed. Fisher said I.E.R. pushed her legs together while he tried to pull them apart. Fisher admitted he knew that I.E.R. did not want to have sex, but claimed that he stopped and apologized when he saw that I.E.R. was really mad. Fisher said that he then took off both his clothes and I.E.R.'s clothes and they went to bed. Fisher denied having sex with I.E.R., denied touching or biting her breast, or otherwise physically assaulting I.E.R. Fisher claimed everything with I.E.R. seemed fine the following day, though he admitted that he knew she was sore and bruised.

The State charged Fisher with one count of rape. At trial, I.E.R.'s testimony was consistent with her earlier statement to law enforcement. The jury convicted Fisher of the lesser included offense of attempted rape.

According to the presentence investigation (PSI) report, Fisher's criminal history included a 1971 Sedgwick County juvenile adjudication identified on the report as "Burglary (Residence)" that was classified as a juvenile person felony. The report also listed a 1988 Sedgwick County conviction of "Burglary (Residence)" that was classified as a person felony. At the sentencing hearing, Fisher and his attorney each advised the district court that they did not object to Fisher's criminal history as reflected in the PSI report. Accordingly, the district court set Fisher's criminal history score at B, denied his

3

motion for a durational departure, and sentenced him to 216 months in prison with lifetime postrelease supervision.

ANALYSIS

Fisher raises the following issues on appeal: (1) the evidence was insufficient to support his conviction, (2) the prosecutor's comments during closing argument deprived him of a fair trial, and (3) the district court improperly classified his prior burglary adjudication and burglary conviction as person felonies when calculating his criminal history prior to sentencing. We will address each of the issues raised in turn.

1. *Sufficiency of the evidence*

Fisher argues that the State failed to present sufficient evidence to support his conviction for attempted rape.

When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or assess the credibility of witnesses. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014).

In order for the jury to find Fisher guilty of attempted rape, the State was required to prove that Fisher performed an overt act toward the commission of rape, with the intent to commit rape, and failed to complete the commission of rape. See K.S.A. 2014 Supp. 21-5301(a); K.S.A. 2014 Supp. 21-5503(a).

4

Relying on *State v. Matlock*, 233 Kan. 1, 660 P.2d 945 (1983), Fisher argues that I.E.R.'s conduct was inconsistent with her claim of rape. In *Matlock*, the defendant's stepdaughter accused him of rape. The stepdaughter's testimony was the only evidence against the defendant, and the court found the victim's testimony to be unbelievable and insufficient to uphold the rape conviction. 233 Kan. at 4-6. The *Matlock* court listed numerous factors casting doubt on the victim's testimony, the most egregious of which indicated the victim waited 15 months to report the rape, voluntarily moved with the defendant after the alleged rape, and demonstrated "friendly feelings" toward him following the rape. 233 Kan. at 4-5. The court also noted a lack of corroborative factors usually found in rape cases, *i.e.*, the lack of an outcry by the victim, the lack of signs on the victim's body or clothing indicating a struggle, the failure of the victim to complain at the earliest possible opportunity, the lack of a reasonable opportunity to commit forcible rape under the circumstances, the lack of a physical examination of the victim, and the lack of evidence of sperm on the victim's body, clothing, or bedding. 233 Kan. at 5.

Fisher suggests that *Matlock* is comparable to the present case because I.E.R. (1) slept in the bed with him after the alleged incident; (2) continued to let him use her car and stay in her apartment; (3) waited 2 days to contact the police or go to the hospital for an exam, only calling the police when Fisher did not repay her; and (4) threw away her pants but not her underwear. Fisher further contends that I.E.R.'s bruising was not indicative of a struggle due to the time that had passed between the alleged rape and her report of the incident.

Fisher's arguments present a challenge to I.E.R.'s credibility. This court cannot reweigh the evidence or assess the credibility of witnesses. *Williams*, 299 Kan. at 525; *State v. Sanders*, 227 Kan. 892, 896, 610 P.2d 633 (1980) ("The function of this court is not to reweigh the evidence, but to determine whether upon the evidence introduced a rational factfinder could have found guilt beyond a reasonable doubt."). Notably, *Matlock* is "the only case of its kind in this state where the Supreme Court directly weighed the

evidence and assessed the credibility of the prosecutrix to reverse a conviction for rape." *State v. Brinklow*, 288 Kan. 39, 53, 200 P.3d 1225 (2009). Since *Matlock*, the Supreme Court has clarified that a complaining witness' testimony alone may be sufficient to sustain a sex crime conviction without corroboration as long as the evidence is clear and convincing and is not so incredible and improbable as to defy belief. See *Brinklow*, 288 Kan. at 53-54; *State v. Borthwick*, 255 Kan. 899, 904, 880 P.2d 1261 (1994).

Moreover, the facts of the present case simply are not analogous to those in *Matlock*. I.E.R. explained during her testimony that she waited 2 days to report the crime to the police because Fisher would not leave her apartment, she was only able to leave her apartment to go to work, and she had no one to cover for her at work until September 9. In any event, such a delay does not compare to the 15-month delay in *Matlock*. And unlike the facts in *Matlock*, I.E.R.'s account of the incident was corroborated by medical and law enforcement testimony, as well as her physical injuries.

Fisher admitted during his police interview that although I.E.R. told him multiple times that she did not want to have sex, they "tussled" as he laid on top of her and tried to force her legs apart. Viewed in the light most favorable to the State, I.E.R.'s testimony, coupled with the evidence of her injuries and Fisher's police interview, was not so incredible or improbable as to defy belief. We find the evidence was sufficient to sustain Fisher's conviction for attempted rape.

2. *Prosecutorial misconduct*

Fisher argues the prosecutor committed misconduct by making comments during closing argument that improperly appealed to the jurors' emotions by invoking their sympathy for I.E.R.

Appellate review of a prosecutorial misconduct claim based on improper comments requires a two-step analysis. First, an appellate court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed, *e.g.*, when discussing evidence. If so, there was misconduct. If the court finds the prosecutor's conduct improper, an appellate court then must determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013).

During closing argument, defense counsel challenged I.E.R.'s version of events, noting that she had waited 2 days to contact the police about the alleged rape and made that report only after Fisher did not repay the funds he withdrew from her bank account as he promised to do. During the State's rebuttal argument, the prosecutor stated, in relevant part:

"You know, it just doesn't add up is what counsel says. It just doesn't add up. This is all about the money. You know what, maybe that's why she delayed. Maybe she waited 48 hours with hope beyond hope that by 5:00 o'clock on Thursday she'd get the money back, and then she could make the report. Maybe not. Maybe she just waited. Really not fair of me to ask that question, why wait? Why do we wait? But that's something we do in society. We ask why. *We ask a woman who's been assaulted why. We put them through the ringer. Why? Why did you wear that short skirt?* Why did you go with that man? Why did you do what you did? Who knows? Every situation is different.

"But the fact is, when confronted about this situation, what's going on in your world, what's going on in this argument, what led to this argument, he never once mentioned money. He never once said, this is about money, she's upset about money. This is all about her getting money.

"Well, she was cheating on me. She got a message from her ex-boyfriend. That's what this is about. And think about that. Whether it's about money, whether it's about being cheated on, whatever it is, both of those are hot button topics. They make people angry. They get people upset, and they lead to arguments.

"And yet, this defendant would have you believe that after they've had this argument, whether it's about money or an ex-boyfriend, that all of a sudden, it was okay, they were going to have sex, even though [I.E.R.] did not want to.

"[Defense counsel] tells you there's tons of reasons not to believe [I.E.R.]. As I told you, you don't have to believe [I.E.R.] to find him guilty of attempted rape. His words give you that." (Emphasis added.)

Fisher argues that the prosecutor's remarks, as emphasized above, were designed to appeal to the jurors' emotions by invoking their sympathy for I.E.R. The State disagrees, arguing the statements were not outside the prosecutor's wide latitude because they were made to counter defense counsel's attack on I.E.R.'s credibility.

"During closing argument, an attorney is given wide latitude in the language and manner of presenting argument and may indulge in impassioned bursts of oratory and may use picturesque speech as long as he or she does not refer to facts not disclosed by the evidence." *State v. Rodriguez*, 269 Kan. 633, 643, 8 P.3d 712 (2000). Although given this wide latitude, "'"[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law."'" *State v. Bennington*, 293 Kan. 503, 532, 264 P.3d 440 (2011). However, appellate courts may also consider whether the prosecutor made the challenged statements in response to the previous argument made by defense counsel during closing argument. See 293 Kan. at 533. To that end, this court considers the alleged improper statements in the context of the entire closing argument. *State v. Burnett*, 293 Kan. 840, 851, 270 P.3d 1115 (2012).

Here, we are not persuaded that the prosecutor's comments were an impermissible attempt to distract the jury from its duty to decide the case based on the evidence and the controlling law. When we consider the allegedly improper statements in the context of the entire closing argument, it is reasonable to conclude the prosecutor's comments were made in response to defense counsel's attack on I.E.R.'s credibility and, thus, were an

attempt to point out that I.E.R. waiting 2 days to contact the police was a fact insufficient to impeach her credibility.

Based on our finding that the challenged statements were within the wide latitude allowed during closing arguments, we need not address the second step of the prosecutorial misconduct analysis.

3. *Criminal history*

Finally, Fisher urges this court to vacate his sentence and remand for resentencing because the district court incorrectly calculated his criminal history score for purposes of sentencing by classifying his 1971 burglary adjudication and his 1988 burglary conviction as person felonies. In response, the State argues Fisher's claims are barred because he failed at sentencing to challenge his criminal history score or object to the accuracy of the PSI report. In the alternative, the State claims the district court properly treated the burglaries as person felonies because the court did not need to make any factual determinations in classifying the crimes as person felonies.

Although Fisher did not challenge the person classification of the prior burglaries in the district court, he may do so for the first time on appeal. In *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015), our Supreme Court held that "a legal challenge to the classification of a prior adjudication for purposes of lowering [one's] criminal history score[]can be raised for the first time on appeal pursuant to K.S.A. 22-3504(1)." See K.S.A. 22-3504(1) (authorizing court to "correct an illegal sentence at any time"); *State v. Jones*, 279 Kan. 809, 810, 112 P.3d 123 (2005) (defining illegal sentence in part as "one that does not conform to the statutory provisions, either in the character or the term of the punishment authorized"); see also *State v. Weber*, 297 Kan. 805, 814-15, 304 P.3d 1262 (2013) (defendant cannot agree to illegal sentence). Although the State suggests that *Dickey* was wrongly decided in this respect, we are duty bound to follow Kansas

Supreme Court precedent. See *State v. Belone*, 51 Kan. App. 2d 179, 211, 343 P.3d 128, *rev. denied* 302 Kan. __ (2015).

"Whether a prior conviction should be classified as a person or nonperson offense involves the interpretation of the KSGA [Kansas Sentencing Guidelines Act]. Interpretation of a statute is a question of law over which appellate courts have unlimited review. [Citations omitted.]" *State v. Keel*, 302 Kan. 560, 571, 357 P.3d 251 (2015), *cert. denied* __ U.S. __ (January 11, 2016).

Relying on K.S.A. 2014 Supp. 21-6810(d)(4)(A), Fisher first challenges classification of his 1971 juvenile adjudication as a person felony. This statute provides that "a juvenile adjudication will decay if the current crime of conviction is committed after the offender reaches the age of 25, and the juvenile adjudication is for an offense . . . [c]ommitted before July 1, 1993, which would have been a class D or E felony if committed by an adult." K.S.A. 2014 Supp. 21-6810(d)(4)(A). Because he was over the age of 25 when he committed the current offense and because burglary was a class D or E felony in 1971, Fisher contends his 1971 burglary adjudication decayed and therefore should not have been considered by the district court in calculating his criminal history.

But in *Keel*, our Supreme Court held that "the legislature intended for all prior convictions and adjudications—including convictions and adjudications occurring before implementation of the KSGA—to be considered and scored for purposes of determining an offender's criminal history score." 302 Kan. at 581. Recognizing that Kansas did not classify pre-KSGA crimes as person or nonperson, the *Keel* majority specifically cited to K.S.A. 1993 Supp. 21-4710(d)(4)—the same language relied on by Fisher in the current version of the statute—to conclude that "a comparison between pre-KSGA and post-KSGA criminal statutes must take place in order to determine whether a juvenile adjudication for a class D or E felony committed before July 1, 1993, will be counted and scored for criminal history purposes." 302 Kan. at 578. Generally speaking, the court in

10

*Keel* stated that if the adjudication is one that is reclassified as a nonperson felony under the KSGA, it would decay and not be counted on the offender's criminal history record, while an adjudication that is reclassified as a person felony under the KSGA does not decay and will be considered and scored for criminal history purposes. 302 Kan. at 578. The court further concluded in *Keel* that "the comparable post-KSGA criminal statute is the one that was in effect at the time the current crime of conviction was committed." 302 Kan. at 581. Based on the Supreme Court's holding in *Keel*, this court first must decide whether the crime should be reclassified under the KSGA as a nonperson or a person felony in order to determine whether Fisher's 1971 burglary adjudication has decayed.

In making this determination, we address Fisher's remaining argument—that the district court's classification of his 1971 and 1988 burglaries as person crimes violated his constitutional rights under *Descamps v. United States*, 570 U.S. __, 133 S. Ct. 2276, 2288-89, 186 L. Ed. 2d 438 (2013) (sentencing judge violates Sixth Amendment by finding facts about prior burglary that were not proven to jury beyond reasonable doubt), and *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (sentencing judge prohibited from finding any fact, other than existence of prior conviction, that increases defendant's sentence). The issue presented by Fisher's argument is controlled by our Supreme Court's decision in *Dickey*, where it addressed an argument identical to Fisher's. The *Dickey* court held that "in order to classify a prior burglary conviction . . . as a person offense under K.S.A. 2014 Supp. 21-6811(d), a sentencing court must find that the prior burglary involved a 'dwelling,'" which is defined by statute as "'a building or portion thereof, a tent, a vehicle or other enclosed space which is used or intended for use as a human habitation, home, or residence.'" 301 Kan. at 1021 (quoting K.S.A. 2014 Supp. 21-5111[k]). Because the burglary statute under which Dickey was convicted did not include an element that the structure burglarized was a dwelling, any determination of whether Dickey's prior burglary involved a dwelling "would necessarily involve judicial factfinding that goes beyond merely finding the existence of a prior conviction or the statutory elements constituting that prior

11

conviction." 301 Kan. at 1021. As a result, the court held the district court's person classification was constitutionally prohibited under *Descamps* and *Apprendi*. 301 Kan. at 1039.

K.S.A. 2014 Supp. 21-5807(a)(1), the burglary statute in effect at the time Fisher was convicted of his current crime, defines burglary as "without authority, entering into or remaining within any . . . [d]*welling*, with intent to commit a felony, theft or sexually motivated crime therein." (Emphasis added.) Burglary under K.S.A. 2014 Supp. 21-5807(a)(1) is a person felony. K.S.A. 2014 Supp. 21-5807(c)(1)(A). The crucial element triggering the classification of this offense as a person felony is that the structure burglarized is a dwelling. See *State v. Roose*, 41 Kan. App. 2d 435, 439, 203 P.3d 18 (2009) ("If the building is a dwelling, the crime is classified as a person felony; if not, it is a nonperson felony.").

The statute under which Fisher was adjudicated in 1971 and convicted in 1988 defined burglary as:

> "[K]nowingly and without authority entering into or remaining within any building, mobile home, tent or other structure, or any motor vehicle, aircraft, watercraft, railroad car or other means of conveyance of persons or property, with intent to commit a felony or theft therein.
>    "Burglary is a class D felony." K.S.A. 21-3715 (Ensley 1988).

Like the statute in *Dickey*, this burglary statute does not include a dwelling element. Thus, the district court's person classification necessarily required judicial findings of fact, *i.e.*, that the buildings or structures Fisher burglarized were dwellings. Because such findings go beyond the mere existence of the prior burglary adjudication and conviction or the identification of the statutory elements of these crimes, they are prohibited by *Descamps* and *Apprendi*. See *Dickey*, 301 Kan. 1018, Syl. ¶ 8.

12

Based on the foregoing analysis, Fisher's convictions are affirmed but the sentence imposed is vacated and the matter remanded for resentencing. On remand, the district court is directed to classify Fisher's 1971 burglary adjudication and 1988 burglary conviction as nonperson crimes, which will result in the decay of Fisher's 1971 burglary adjudication as well as a lower criminal history score and a lower presumptive sentence under the sentencing guidelines for his current conviction. See *State v. Luarks*, 302 Kan. 972, 360 P.3d 418, 422-23 (2015); *Keel*, 302 Kan. at 578.