No. 109,808

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

VINCENT A. RAMIREZ,
*Appellant*.

SYLLABUS BY THE COURT

1.

The trial court answering the jury's question by a written note sent to the jury room rather than by calling the jurors to the courtroom to answer their question in the defendant's presence violated K.S.A. 22-3420(3) and denied the defendant his right under the Sixth Amendment to the United States Constitution to be present at all critical stages of his trial. But using the four-factor test in *State v. McGinnes*, 266 Kan. 121, 132, 967 P.2d 763 (1998), and applying the "beyond a reasonable doubt" standard, the error did not affect the outcome of the trial, so the error was harmless.

2.

The trial court answering the jury's question by a written note sent to the jury room rather than by calling the jurors to the courtroom to answer their question did not deny the defendant's right to a public trial.

3.

The trial court answering the jury's question by a written note sent to the jury room rather than by calling the jurors to the courtroom to answer their question did not deprive the defendant of his right to an impartial judge.

1

4.

When the defendant participated in formulating the trial court's response to a jury question, expressed agreement with the court's response, and failed to object, the defendant has waived the right to challenge the court's response on appeal.

5.

In considering a criminal defendant's claim that the evidence was insufficient to support a conviction, the appellate court examines the evidence in the light favoring the State, the prevailing party, to determine if a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In doing so, the court does not reweigh the evidence, resolve evidentiary conflicts, or determine the credibility of witnesses.

6.

There is no distinction between direct and circumstantial evidence in terms of probative value. A verdict may be supported by circumstantial evidence if such evidence provides a basis from which the factfinder may reasonably infer the existence of the fact in issue. The circumstantial evidence need not exclude every other reasonable conclusion or inference to support a conviction.

7.

Criminal possession of a firearm occurs when a person is in possession of a firearm within 5 years of having been convicted of a felony or within 5 years of having been released from imprisonment for a felony. K.S.A. 2011 Supp. 21-6304(a)(2).

8.

A defendant does not aid and abet another person in the crime of criminal possession of a firearm when there is no evidence that such other person, in possessing a firearm, is guilty of the crime.

2

9.

To support a conviction of criminal possession of a firearm based upon an aiding and abetting theory under K.S.A. 2011 Supp. 21-5210, when the defendant did not possess a firearm but the person the defendant aided and abetted did, the defendant's felony record is immaterial. To support such a conviction the evidence must establish that the person the defendant aided and abetted possessed the firearm within 5 years of that person having been convicted of a felony or having been released from imprisonment for a felony.

10.

In closing argument the prosecutor misstated the law when he argued that the defendant, who had been convicted of a felony or had been released from prison for a felony within 5 years before the crime was committed, was guilty of criminal possession of a firearm because he aided and abetted the person who had actual possession of the firearm when there was no evidence the person who actually possessed the firearm had been convicted of a felony or released from prison for a felony within 5 years before the crime was committed.

11.

Misstating the law applicable to the case in closing argument is outside the wide latitude allowed a prosecutor in discussing the case. Such a misstatement constitutes prosecutorial misconduct, requiring the court to consider whether the result was the defendant being denied a fair trial.

12.

In determining whether a prosecutor's misstatement of the law in closing argument denied the defendant a fair trial, the court considers (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3)

3

whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors.

13.

Under the facts of the case, the prosecutor's remarks were neither gross nor flagrant. Nor did the prosecutor exhibit any ill will towards the defendant.

14.

Under the facts of the case, the prosecutor's misstatement of the law cannot be said to have had little weight in the minds of the jurors. The prosecutor's argument on the criminal possession of a firearm charge easily could have left the jurors with the false impression that they need not consider whether the person possessing the weapon could have been guilty of the crime so as to make the defendant vicariously liable for it. Rather than there being direct and overwhelming evidence to support the defendant's conviction, the evidence against the defendant on the charge of criminal possession of a firearm was nonexistent because there was no evidence the person who had possession of the firearm had a felony record.

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed September 26, 2014. Affirmed in part and reversed in part.

*Johnathan M. Grube*, of Kansas Appellate Defender Office, for appellant.

*Brett H. Richman*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., MCANANY, J., and BUKATY, S.J.

MCANANY, J.:  Vincent A. Ramirez appeals his convictions of aggravated robbery, conspiracy to commit aggravated robbery, aggravated assault, and criminal possession of a firearm arising out of the robbery of El Poblano Market in Kansas City.

Pedro Rodriguez, the owner of El Poblano, had seen Ramirez and Jorge Garcia in his store 2 or 3 weeks before the robbery. Because of the way they were acting Rodriguez thought they were going to rob him.

On the day of the robbery, two Hispanic males entered the market wearing black gloves and blue and black hoodies with bandanas covering their faces. One man pointed a shotgun at Rodriguez and his customers, who were ordered to get on the floor, while the other robber handed the clerk a bag and, in Spanish, demanded the money. Once Rodriguez complied, the two men left the store. Rodriguez looked out of the window and saw three men running across the street. The third man was dressed the same as the other two. Luis Hernandez saw the men enter a Lincoln automobile after the robbery. One of the men was carrying "a rifle or something" and fired the gun once before they fled in the Lincoln.

Rodriguez recognized the voice of one of the robbers as that of Oscar Mendoza, a customer who used to come to the market with Hilary Caples in a white Lincoln. Mendoza was the father of Caples' three children.

Two days after the robbery, Rodriguez saw Mendoza in the white Lincoln getaway car. Rodriguez called the police. The police stopped the car which Caples was driving. Mendoza was a passenger.

The police searched the Lincoln and found a pair of gloves, a single black glove, a pair of jeans, a jacket, a hooded sweatshirt, a wooden baseball bat, a speed loader, and one spent .380 caliber cartridge. The gloves and clothing matching the descriptions of

5

items the robbers were wearing as reported by eyewitnesses. The wooden baseball bat matched the weapon Caples would later describe Ramirez carrying as he stood watch outside of the store during the robbery.

When questioned by the police, Caples confessed that she, Garcia, Ramirez, and Mendoza participated in the robbery. They had planned the robbery at the home of Ruby Trevino. Garcia kept a shotgun at the Trevino home. Caples drove them all to the market and dropped them off outside. She parked a block away and waited for the men to complete the robbery. She then drove the getaway car, the white Lincoln. She said Ramirez, who had a baseball bat with him, served as the lookout man outside the market while Mendoza and Garcia went inside. Mendoza was the one who demanded the money in Spanish while Garcia held the shotgun. All the men had bandanas on their faces and wore gloves. Garcia fired a shot from his gun before reentering the Lincoln. Caples then drove them back to Trevino's house.

The police searched the Trevino residence and found the barrel from a shotgun hidden under some children's clothing. Ramirez was at the Trevino house and was arrested.

At trial, Caples testified she pled guilty to a robbery charge for her participation in the El Poblano robbery and had received probation for her part in the crime. As part of her plea agreement, she agreed to testify against Oscar, Ramirez, and Garcia but was not guaranteed probation in exchange for her testimony.

Following the State's case, the defense moved the court for a judgment of acquittal on all charges. With respect to the charge of criminal possession of a firearm, Ramirez argued there was no evidence he ever possessed a firearm and Garcia carrying a weapon should not be imputed to him. The court denied Ramirez' motion.

Ramirez presented no evidence on his own behalf. At the court's instructions conference, Ramirez objected to the proposed instruction on criminal possession of a firearm. The first element in his proposed instruction on this charge was "[t]hat the defendant . . . knowingly possessed a firearm." The court's Instruction No. 10 added the phrase "or another for whose conduct he was criminally responsible" to the first element. Ramirez' counsel argued that Garcia's conduct should not be imputed to Ramirez unless Garcia was a proven felon, and there was no such evidence. Earlier in the proceedings, Ramirez had stipulated to his criminal past. But Ramirez objected to the court's proposed instruction No. 11 recounting this stipulation. Ramirez' objections were overruled. The court included in its jury instructions the following:

"The defendant is charged in Count III with Criminal Possession of a Firearm. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant, or another for whose conduct he was criminally responsible, knowingly possessed a firearm;

"2. That the defendant within five years preceding such possession had been convicted or released from imprisonment for a felony; and

"3. That this act occurred on or about the 28th day of November, 2011, in Wyandotte County, Kansas." (Instruction No. 10.)

"The following facts have been agreed to by the parties and are to be considered by you as true:

"1. That the defendant, within five years preceding November 28, 2011, had been convicted or released from imprisonment for a felony.

"This prior conviction, or any other evidence of misconduct not charged in this case, may be considered only for the purpose for which it was introduced, and not to infer the defendant's guilt with regard to the four offenses charged." (Instruction No. 11.)

With reference to Caples' testimony implicating Ramirez, the court instructed the jury that it should consider accomplice testimony with caution.

During closing argument, the prosecutor stated:

> "Number 10 is criminal possession of a firearm. It says the defendant, or another whose conduct he was criminally responsible, knowingly possessed a firearm. Same theory as the aggravated robbery. Whether you're the doorman, the driver, the money guy, or the gun guy, you possessed the firearm as a group to commit that crime.

> "And we know the defendant within the five years preceding such possession had been convicted or released from imprisonment for a felony because Instruction No. 11 says that was agreed to."

During deliberations, the district court received the following question from the jury: "[I]f someone knows a crime is going to be perpetrated and you don't report it, are you guilty of said crime?" The judge discussed the question on the record with both counsel and Ramirez present and responded to the question, with the approval of all counsel, as follows: "I don't understand your question. Can you be more specific?" This written response was delivered to the jury room by the court's bailiff.

Later during deliberations, the jury submitted a second question to the court: "If we think he is guilty of knowing the robbery was going to happen, but we don't think he was there, is he guilty?" Again, the judge discussed the question with both counsel and with Ramirez being present.

> "[Defense Counsel]: I would say no.
> "THE COURT: I would propose that they reread the aiding and abetting instructions and there's two of them. I can't answer that question directly.
> "[Prosecutor]: Right.
> "THE COURT: Oh, well. I mean, that's—I'll be happy to listen to any other suggestions.
> "[Prosecutor]: I think that's the only way we can answer it, Judge.
> "THE COURT: That would be 17 and 18.

"[Defense Counsel]: Well, I think the law, except in a few circumstances, doesn't require you to report a crime.

"THE COURT: Well, that's—the reporting issue is—we're past that.

"[Defense Counsel]: Okay.

"THE COURT: When they asked about the reporting issue, I don't know what they were asking, but—

"[Defense Counsel]: Okay.

"THE COURT: —I asked them what—could they be more specific in what they want and this is their response: If we think he's guilty of knowing the robbery was going to happen, but we don't think he was there, is he guilty?

"[Defense Counsel]: Okay.

"THE COURT: Well, it just—it depends on what you believe the evidence is.

"[Defense Counsel]: (Nodding head up and down.)

THE COURT: And 17 and 18 are the aiding and abetting instructions and it says pretty plainly what the circumstances are legally in which they can find him guilty or not guilty.

"[Defense Counsel]: (Nodding head up and down.)

"THE COURT: I don't know how else to answer it and that's—if you have another suggestion, I'd be happy to listen to it.

"[Defense Counsel]: I don't. I think that's the best way to approach it.

"[Prosecutor]: Sounds good, Judge.

"THE COURT: I'm gonna suggest and I'll answer it in this fashion: Please reread Instructions 17 and 18. And they are the aiding and abetting instructions. Any objection from either side about that?

"[Prosecutor]: None from the State.

"[Defense Counsel]: No, Your Honor.

. . . .

"THE COURT: Okay. That's what I'll do and then we'll see.

"Okay. We'll give it to the bailiff to send back in and we'll see what happens."

The bailiff delivered the court's written response. Thereafter, the jury found Ramirez guilty as charged.

9

Ramirez moved for new trial and/or for findings of not guilty arguing, among other things, that there was no evidence he possessed a firearm and no evidence that the person who did possess the firearm was a felon. The court denied relief, and following sentencing, Ramirez appealed.

*Claims on Appeal*

On appeal, Ramirez challenges (1) the district court's procedure for answering the jury questions which, he asserts, deprived him of his rights to be present at all critical stages of his trial, to have an impartial judge, and to have a public trial; (2) the substance of the court's answer to the second jury question; (3) the sufficiency of the evidence to support his convictions of aggravated robbery, conspiracy to commit aggravated robbery, and aggravated assault (but not criminal possession of a firearm); and (4) the prosecutor's closing argument on the criminal possession of a firearm charge.

*Answering the Jury Questions:  Structural vs. Harmless Errors*

Ramirez argues the claimed errors in answering the jury questions are structural and can never be viewed as harmless. He finds support in *Arizona v. Fulminante*, 499 U.S. 279, 308, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). In *Fulminante*, the issue was whether admitting into evidence an involuntary confession could ever be harmless. The Supreme Court noted that some constitutional rights, such as the use of a coerced confession, the right to counsel, and the right to an impartial judge, cannot be harmless. But the Supreme Court has never held that the process used in Ramirez' case resulted in a structural error.

With respect to the right to an impartial judge, the *Fulminante* court cited *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927), a case involving the judge's pecuniary interest in the outcome of the case. *Tumey* involved the practice of the town

10

mayor serving as the judge of the municipal court and personally receiving the court costs assessed against a defendant appearing in that court. See also *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972), in which the village mayor, whose village budget was derived substantially from court fines and fees, also served as judge of the village court. But Ramirez does not contend that the trial judge in his case had any conflict of interests or had any pecuniary interest in having him convicted. *Fulminante* does not control. Nor does *Tumey* or *Village of Monroeville*. We find no Supreme Court case holding the process used in Ramirez' case to constitute structural error.

Ramirez also relies on *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984), to support his contention that the denial of a public trial cannot be harmless. But in *Waller*, the issue was whether the defendant's right was infringed when the entire hearing on the suppression of evidence was closed to the public. The Supreme Court found that "suppression hearings often are as important as the trial itself." 467 U.S. at 46. Further, "a suppression hearing often resembles a bench trial:  witnesses are sworn and testify, and of course counsel argue their positions." 467 U.S. at 47. None of this applies to the procedure used by the trial court in Ramirez' case. As noted earlier, the Supreme Court has never held that the process used in Ramirez' case resulted in a structural error with respect to the right to a public trial.

Thus, we conclude that if there was any error it is subject to a harmless error analysis.

*The Procedure for Answering the Jury Questions*

Resolution of Ramirez' arguments on this issue involves matters of statutory and constitutional interpretation. These are questions of law over which this court has unlimited review. *State v. Hilt*, 299 Kan. 176, 200, 202, 322 P.3d 367 (2014).

11

Though Ramirez did not object to the court's procedure for answering the jury questions as required by *State v. Coman*, 294 Kan. 84, 89, 273 P.3d 701 (2012), we will follow the trail our Supreme Court blazed in considering this issue without the defendant having preserved the issue for appeal. See *State v. Bowen*, 299 Kan. 339, 354-55, 323 P.3d 853 (2014) (addressing identical issues on appeal despite the defendant's failure to object to the procedure at the district court); *State v. Bell*, 266 Kan. 896, 918-20, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999) (same).

*Right to Be Present*

With respect to the claim that Ramirez was denied his right to be present at all critical stages of his trial, K.S.A. 22-3420(3) states:

> "After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

Our Supreme Court has construed this to require any question from the jury concerning the law or evidence to be answered in open court in the defendant's presence unless the defendant is voluntarily absent. *State v. King*, 297 Kan. 955, 967, 305 P.3d 641 (2013). Our Supreme Court has found the procedure used in our present case violates K.S.A. 22-3420(3). *State v. Verser*, 299 Kan. ___, ___, 326 P.3d 1046 (2014). According to our Supreme Court, this procedure also violates a defendant's rights under the Sixth Amendment to the United States Constitution, which guarantees that a criminal defendant may be present at every critical stage of his or her trial. 299 Kan. at ___. Thus, we conclude the district court erred in not recalling the jurors to the courtroom to answer their questions.

12

Next, we apply the federal constitutional harmless error standard from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), to determine if the error requires us to reverse Ramirez' convictions. *State v. Herbel*, 296 Kan. 1101, 1110-11, 299 P.3d 262 (2013). Under this standard,

> "error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011).

In the context of the trial court's improper communication of its response to a jury question, we use the four-factor test in *State v. McGinnes*, 266 Kan. 121, 132, 967 P.2d 763 (1998), to determine whether the district court's error requires reversal. See *Verser*, 299 Kan. at ___. Those factors are (1) the overall strength of the prosecution's case; (2) whether an objection was lodged to the improper communication; (3) whether the communication concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter, and the manner in which it was conveyed to the jury; and (4) the ability of the posttrial remedy to mitigate the constitutional error. *McGinnes*, 266 Kan. at 132.

With respect to the first factor, the State's case against Ramirez was rather strong, given the damning testimony from Caples, the supporting testimony of other witnesses, and the physical evidence consistent with Caples' testimony retrieved from the Lincoln and the home search.

With respect to the second factor, Ramirez did not object to the court's method of communicating with the jury.

With respect to the third factor, Kansas courts have generally considered written answers to jury questions as being less critical than detailed jury communications such as reading back trial testimony. *State v. Womelsdorf*, 47 Kan. App. 2d 307, 322-24, 274 P.3d 662 (2012), *rev. denied* 297 Kan. 1256 (2013). Here, the district court's first communication with the jurors was innocuous and insignificant. It provided no substantive information to the jury. It merely stated that the district court did not understand the question and asked for clarification. The second communication was substantive but provided no new information to the jury. It merely referred to jury instructions the court had previously given in open court and in Ramirez' presence. Further, court bailiffs take an oath that prohibits them from communicating with the jury unless ordered to do so by the court. Ramirez provides no evidence of any untoward events in the jury room arising from the bailiff's delivery of the court's written response.

With respect to the fourth factor, Ramirez did not raise this issue in his posttrial motion.

We conclude that there is no reasonable possibility the district court's failure to read the answer to the jury's question in open court in Ramirez' presence contributed to his guilty verdicts. The jury received no new information from either communication, and there is no evidence of any misconduct by the bailiff in delivering the court's response to the jury. The error was harmless.

*Right to a Public Trial*

Ramirez also argues that the procedure used by the district court violated his right to a public trial under the Sixth Amendment of the United States Constitution and § 10 of the Kansas Constitution Bill of Rights because the communication of the court's response took place in the jury room, not the public courtroom.

14

This argument was raised in *Womelsdorf*. The court in *Womelsdorf* found no violation of the right to a public trial, noting that in the same procedure used in Ramirez' trial, the court's written responses to the jury's questions were available as part of the public court file and not hidden from public view. 47 Kan. App. 2d at 324-25. Further, the discussion of the court's response was on the record. We find the analysis in *Womelsdorf* persuasive.

As noted earlier, Ramirez relies on *Waller* to support this claim. The Court in *Waller* noted that it "has never considered the extent to which that right [to a public trial] extends beyond the actual proof at trial." 467 U.S. at 44. Delivering to the jury room the court's written answer to a jury's question was not part of the evidence-producing phase of the trial considered in *Waller*. The *Waller* Court noted the qualified First Amendment right of the press and the public to attend voir dire, as well as the evidence-producing portion of the trial itself. But the *Waller* Court did not consider the issue now before us, and we find no decision by the United States Supreme Court finding the practice of answering jury questions in the fashion used in Ramirez' case violated the constitutional right to a public trial.

The court's response to the jury's first question was substantively meaningless. The court's response to the jury's second question provided no new facts or legal principles to consider. Both questions were discussed on the record. Ramirez does not contend this discussion took place somewhere other than in the open court room. In answering the second question, the jurors were simply referred to instructions previously given to them in open court in the presence of Ramirez and any member of the public who desired to be present.

The requirement of a public trial assures that the judge and prosecutor act responsibly. It also discourages witnesses from committing perjury when testifying. These factors have no application in the procedure employed here. The conduct of the

15

court and prosecutor in discussing the questions and appropriate responses was on the record and in open court. No new testimony was involved. We find no violation of the constitutional right to a public trial.

*Right to an Impartial Judge*

Ramirez claims he was denied his Fourteenth Amendment right to an impartial judge under the United States Constitution because no judge was present when the actual communication to the jury took place.

As noted earlier, Ramirez finds support in *Tumey*, 273 U.S. 510, and *Village of Monroeville*, 409 U.S. 57. As discussed earlier, neither case even remotely involves the facts now before us, and neither applies. Ramirez makes no assertion that the trial judge in his case had a conflict of interests or a pecuniary interest in having him convicted.

This issue was addressed and rejected in *Womelsdorf*. We find *Womelsdorf* persuasive on this issue. Besides, we find no basis upon which to conclude that the outcome of the trial would have been any different had the judge personally addressed the jury in the courtroom, rather than through his written response.

*Cumulative Error*

Ramirez argues that the individual instances of error—both statutory and constitutional—regarding the procedure used here by the court acted cumulatively to deny him a fair trial, requiring reversal of his convictions. Here, we found error only with respect to Ramirez not being present when the court's response was delivered to the jury, but we concluded the error was harmless. Thus, there are not multiple harmless errors to accumulate to warrant relief.

16

*Substance of Court's Response*

Ramirez next challenges the substance of the district court's answer to the jury's second question, which he characterizes as not meaningful because it did not answer the question asked. Ramirez argues that the jury's question went to the defendant's guilt for failing to report a crime about which he had knowledge as opposed to a question seeking clarification of the law on aiding and abetting.

The verbatim exchanges between court and counsel on these questions are set forth above. They can be reduced to the following.

The first jury question asked the court if a person is guilty if that person knows a crime is going to be committed and does not report it. The court discussed the question with counsel and concluded the court needed further clarification from the jury. All counsel agreed.

The second question asked if the defendant is guilty if he knew the robbery was going to happen but was not present for the robbery. The court discussed the question with counsel and proposed to tell the jury to read the aiding and abetting instructions. Defense counsel said he did not think the law required one to report a crime. The court responded that the reporting issue was the substance of the first question. "We're past that." Now the issue turns on the aiding and abetting instructions. "I don't know how else to answer it . . . . [I]f you have another suggestion, I'd be happy to listen to it." Defense counsel said he did not have a different answer and thought the court's response was "the best way to approach it." The court decided to tell the jurors to read the aiding and abetting instructions. The court asked if there were any objections. Defense counsel said he had none.

*State v. Groschang*, 272 Kan. 652, 672-73, 36 P.3d 231 (2001), was a murder case. One of the defenses was that at the time of the crime, the defendant had been profoundly affected by the drug Zoloft which had been prescribed for his depression. An expert witness read at trial a section of the Physician's Desk Reference (PDR) relating to Zoloft. The PDR itself was not admitted into evidence. During deliberations, the jury asked to see the PDR. After conferring with counsel, and with the agreement of counsel, the court sent to the jury sections from the PDR which had been read at trial.

On appeal, the defendant claimed the court erred in failing to include a relevant sentence in the PDR which the expert had read to the jury at trial. Our Supreme Court noted that the defendant had participated in these proceedings and had every opportunity to object or suggest a different response to the jury. The court concluded:

> "Clearly the defendant had the opportunity to object and to inform the trial court of his dissatisfaction with the court's response to the jury request while the court still had a chance to correct any error. By failing to object, the defendant waived his right to raise this issue on appeal." 272 Kan. at 673.

Based on *Groschang*, we conclude Ramirez failed to preserve this issue for appellate review.

*Sufficiency of the Evidence of Aggravated Robbery, Conspiracy to Commit Aggravated Robbery, and Aggravated Assault*

Ramirez claims the evidence at trial was insufficient to support his convictions of aggravated robbery, conspiracy to commit aggravated robbery, and aggravated assault. He argues that there was no physical evidence proving he took part in the crimes, and the eyewitnesses were unable to identify him because the assailants' faces were covered by

18

bandanas. Further, while police recovered physical evidence that corroborated Caples' testimony about the crime, none of that evidence physically linked Ramirez to the crime.

In considering this claim, we examine the evidence in the light favoring the State to determine if a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Charles*, 298 Kan. 993, 997, 318 P.3d 997 (2014). In doing so, we do not reweigh the evidence, resolve evidentiary conflicts, or determine the credibility of witnesses. 298 Kan. at 997. There is no distinction between direct and circumstantial evidence in terms of probative value. *State v. McBroom*, 299 Kan. ___, 325 P.3d 1174, 1188 (2014). A verdict may be supported by circumstantial evidence if such evidence provides a basis from which the factfinder may reasonably infer the existence of the fact in issue. The circumstantial evidence need not exclude every other reasonable conclusion or inference to support a conviction. *State v. Scaife*, 286 Kan. 614, 618, 186 P.3d 755 (2008). It is only in rare cases in which trial testimony is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

We have outlined the evidence in detail earlier in this opinion. We need not repeat it all here. It suffices to say that viewing that evidence in the light favoring the State, there was sufficient evidence that Ramirez participated in the planning and execution of the armed robbery that included the aggravated assault of the victims in the market. While much of the evidence came from Caples, none of the physical evidence associated with the robbery found by the police was inconsistent with Caples' description of the crime. The jury heard testimony about Caples' plea deal. The jury was cautioned about Caples' testimony, but it found her testimony to be credible. "'[U]ncorroborated testimony of an accomplice is sufficient to sustain a conviction.'" *State v. Lopez*, 299 Kan. 324, 330-31, 323 P.3d 1260 (2014) (quoting *State v. Bey*, 217 Kan. 251, 260, 535 P.2d 881 [1975]). We do not substitute our credibility evaluation for that of the jury.

19

*Criminal Possession of a Firearm*

Ramirez was convicted of criminal possession of a firearm based on the shotgun Garcia, his accomplice, carried and used in the robbery. Ramirez does not contend the district court erred in refusing to direct a verdict in his favor on this charge at the close of the State's case-in-chief. Likewise, he does not contend the district court erred in instructing the jury regarding the elements needed to convict him for criminal possession of a firearm. Rather, he contends that in closing argument the State "misstated the law when it told the jury to find Mr. Ramirez guilty if he aided and abetted a felon in possession of a firearm." We think Ramirez meant to say "if he, a felon, aided and abetted" because he argues that there was no evidence that Garcia, who held the shotgun, was a convicted felon at the time of the robbery and, thus, could not have committed the crime of criminal possession of a firearm.

Though there was no objection at trial to the State's argument in closing, Ramirez argues that no objection was needed to preserve the issue as determined in *State v. Morton*, 277 Kan. 575, 583-84, 86 P.3d 535 (2004), a case involving a claim of prosecutorial misconduct.

Criminal possession of a firearm requires a showing that the defendant either had been convicted of a felony or released from prison for a felony within 5 years before possessing the firearm. K.S.A. 2011 Supp. 21-6304(a). Ramirez stipulated in instruction No. 11 that he was such a felon.

The State did not contend that Ramirez possessed a firearm during the course of the robbery or at any other time. The State predicates Ramirez' criminal liability on him having aided and abetted Garcia. But Ramirez argues that there was no evidence Garcia, who actually possessed the weapon, possessed it illegally; that is, there was no evidence Garcia had been convicted of a felony or released from prison for a felony within 5 years

20

before the robbery. Ramirez argues that even if Garcia's conduct was imputed to Ramirez, Garcia's conduct in possessing the shotgun was not illegal because there was no evidence that Garcia was a felon at the time. Thus, there was no evidence Ramirez aided and abetted a felon in the possession of a firearm.

Based on this analysis, Ramirez argues that the prosecutor, in discussing the court's instructions, improperly argued to the jury in closing:

> "Number 10 is criminal possession of a firearm. It says the defendant, or another whose conduct he was criminally responsible, knowingly possessed a firearm. Same theory as the aggravated robbery. Whether you're the doorman, the driver, the money guy, or the gun guy, you possessed the firearm as a group to commit that crime.

> "And we know the defendant within the five years preceding such possession had been convicted or released from imprisonment for a felony because Instruction No. 11 says that that was agreed to."

We analyze the prosecutor's remarks using the rubric of prosecutorial misconduct. In doing so, we must first determine whether the prosecutor's comments were outside the wide latitude allowed a prosecutor in discussing the evidence. *State v. Burnett*, 293 Kan. 840, 850, 270 P.3d 1115 (2012). If they were, we consider whether the improper comments constitute plain error, meaning whether the statements prejudiced the jury against Ramirez and denied him a fair trial. See 293 Kan. at 850.

*Misstatement of Law*

The claimed misstatement of the law here requires us to interpret various statutes. These are questions of law over which we exercise unlimited review. *State v. Edwards*, 299 Kan. ___, ___, 327 P.3d 469 (2014).

21

With respect to the charge of criminal possession of a firearm, the jury was instructed:

"The defendant is charged in Count III with Criminal Possession of a Firearm. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant, *or another for whose conduct he was criminally responsible*, knowingly possessed a firearm;

"2. That the defendant within five years preceding such possession had been convicted or released from imprisonment for a felony; and

"3. That this act occurred on or about the 28th day of November, 2011, in Wyandotte County, Kansas." (Emphasis added.) (Instruction No. 10.)

"The following facts have been agreed to by the parties and are to be considered by you as true:

"1. That the defendant, within five years preceding November 28, 2011, had been convicted or released from imprisonment for a felony.

"This prior conviction, or any other evidence of misconduct not charged in this case, may be considered only for the purpose for which it was introduced, and not to infer the defendant's guilt with regard to the four offenses charged." (Instruction No. 11.)

The wording of instruction No. 10 generally followed K.S.A. 2011 Supp. 21-6304(a)(2), which defines criminal possession of a firearm by a felon, and PIK Crim. 3d 64.06, the applicable pattern instruction. But the court added the phrase "or another for whose conduct he was criminally responsible," following "the defendant," in the first element of the PIK instruction. While for reasons not entirely clear, Ramirez does not contend the court erred in giving this instruction, what is clear is that the alteration of the PIK instruction contributed substantially to the confusion that followed.

Consistent with K.S.A. 2011 Supp. 21-5210, our aiding and abetting statute, the trial court instructed the jury as follows:

22

"A person who, either before or during its commission, intentionally *aids, abets*, advises, hires, counsels or procures *another to commit a crime* with intent to promote or assist in its commission is *criminally responsible for the crime committed* regardless of the extent of the defendant's participation, if any, in the actual commission of the crime." (Emphasis added.) (Instruction No. 17.)

"A person who intentionally aids, abets, advises, hires, counsels or procures another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable." (Instruction No. 18.)

As the prosecutor properly argued in closing, the aiding and abetting instruction applied to the aggravated robbery charge. Ramirez was convicted of aggravated robbery though he did not personally take money by force using a dangerous weapon. Under the concept of aiding and abetting, he was criminally responsible for the acts of his coconspirators who did so.

But the prosecutor extended the aiding and abetting argument to the criminal possession of a firearm charge, arguing that Ramirez was criminally responsible for Garcia carrying the shotgun in the robbery based on the fact that Ramirez (not Garcia) was a felon at the time, when he argued:

"Number 10 is criminal possession of a firearm. It says the defendant, or another whose conduct he was criminally responsible, knowingly possessed a firearm. Same theory as the aggravated robbery. Whether you're the doorman, the driver, the money guy, or the gun guy, you possessed the firearm as a group to commit that crime.

"And we know the defendant within the five years preceding such possession had been convicted or released from imprisonment for a felony because Instruction No. 11 says that was agreed to."

23

As instructed by the court, one who "intentionally aids, abets . . . another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed." The "crime committed" at issue here is the crime of criminal possession of a firearm. Ramirez' criminal liability was predicated on him having aided and abetted Garcia in the crime of criminal possession of a firearm. If there is no evidence that Garcia committed the crime, then it must follow that under an aiding and abetting theory Ramirez cannot be found liable for the crime. One cannot have vicarious criminal responsibility for aiding another in the commission of a lawful act. Here, there was no evidence that Garcia committed the crime because there was no evidence he was a convicted felon at the time of the robbery.

The State relies on *State v. Cunningham*, 236 Kan. 842, 695 P.2d 1280 (1985), and *State v. Martin*, 241 Kan. 732, 740 P.2d 577 (1987), for support. In *Cunningham* two men robbed a grocery store. One of the men carried a firearm. The trial court refused to dismiss a criminal possession of a firearm charge based on the defendant's argument that there was no evidence that he, as opposed to his companion, had actual control over the firearm. The court noted that actual control is not needed, citing instances in which control was inferred when a gun was found in the trunk of the defendant's car, in a car over which the defendant asserted control, in a drawer in a bedroom the defendant shared with his wife, or when "two or more persons may have the power of control over [burglary tools] and intend to control and use them jointly." 236 Kan. at 846. Our Supreme Court concluded:

> "It is well settled that all participants in a crime are equally guilty without regard to the extent of their participation, and that any person who counsels, aids or abets in the commission of an offense may be charged, tried and convicted *in the same manner as though he were a principal*. [Citation omitted.]" (Emphasis added.) 236 Kan. at 846.

24

The court in *Cunningham* was not confronted with the issue we now face. There apparently was no issue in *Cunningham* regarding whether the defendant's coconspirator could have been convicted of criminal possession of a firearm. But the court recognized that Cunningham could be convicted "in the same manner as though he were a principal." 236 Kan. at 846. Under this principle, Ramirez could not be convicted if there was no evidence to support a Garcia conviction.

In *Martin*, the defendant had a prior felony conviction, but nothing in the decision indicates whether his accomplice also had a prior felony so as to make the defendant's possession of a firearm criminal. Without that information, the *Martin* case is not helpful.

We find the decision in *State v. Sophophone*, 270 Kan. 703, 704, 19 P.3d 70 (2001), to be somewhat instructive. There, the police interrupted four men in the course of a home burglary and arrested the defendant. As one of the others ran, he fired a shot at the police. An officer returned fire and killed the escaping burglar. The defendant was charged with felony murder for the death of the escaping burglar, which was the result of the police officer's lawful act in self-defense. In discussing the defendant's culpability under an aiding and abetting theory, the Kansas Supreme Court noted:

> "The overriding fact which exists in our case is that neither [the defendant] nor any of his accomplices 'killed' anyone. The law enforcement officer acted lawfully in committing the act which resulted in the death of the co-felon. This does not fall within the language of the [aiding and abetting statute] since the officer committed no crime." 270 Kan. at 712.

The court ultimately reversed the defendant's felony-murder conviction, holding that when the killing resulted from the lawful acts of a law enforcement officer in attempting to apprehend a co-felon, the defendant could not be held criminally responsible for the death of his co-felon. 270 Kan. at 713.

25

Obviously, Ramirez' hands are not clean like those of the officer in *Sophophone*. Ramirez could have been convicted of criminal possession of a firearm if the State had shown he had physically possessed the shotgun at any point or if the State had shown that Garcia had the requisite felony record. Garcia's *possession* of the shotgun may have been perfectly legal, regardless of the fact that his *use* of the shotgun clearly was not.

The trial court's instructions on aiding and abetting were correct statements of the law and factually fit the aggravated robbery charge. But the interplay between the aiding and abetting instructions and the criminal possession of a firearm instruction was hopelessly confusing.

Under instruction No. 10, Ramirez could be found guilty of criminal possession of a firearm if "another for whose conduct he was criminally responsible" (Garcia) knowingly possessed the shotgun (which he did) and Ramirez was a recent felon (which he was). But under the aiding and abetting instructions, Ramirez was guilty of criminal possession of a firearm only if he aided or abetted Garcia in the commission of that crime, which required Garcia (not Ramirez) to be a recent felon (which he apparently was not).

A prosecutor steps outside of the considerable latitude given to prosecutors if he or she deliberately misstates the controlling law. *Burnett*, 293 Kan at 850. Here, the prosecutor's argument was not a mere slip of the tongue. Though prompted by instruction No. 10, his argument misstated the law with respect to aiding and abetting. Thus, we follow the protocol in *State v. Raskie*, 293 Kan. 906, 918, 269 P.3d 1268 (2012): "Because there was a misstatement of the law, we move to the second step of the prosecutorial misconduct analysis to determine if [the defendant] was denied a fair trial."

To determine whether Ramirez was denied a fair trial, we must consider three factors: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct

26

showed ill will on the prosecutor's part; and (3) whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. *State v. Jones*, 298 Kan. 324, 335, 311 P.3d 1125 (2013). None of these three factors is individually controlling, and the third factor cannot override the first two factors unless the reviewing court can say that the harmlessness tests of both K.S.A. 60-261and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), have been met. *Jones*, 298 Kan. at 335.

### *Gross and Flagrant*

In considering whether the prosecutor's misstatement was gross and flagrant, we note that the prosecutor's closing arguments are set forth in slightly more than 10 pages of the trial transcript. The prosecutor's argument on the criminal possession of a firearm charge comprises two paragraphs—86 words—of that argument. The prosecutor's accurate remarks recounted the court's troublesome instruction on the elements of the crime, but he simply failed to take into account the application of the aiding and abetting instructions to this charge. Further, Ramirez does not contend the prosecutor's remarks were gross or flagrant. Under the circumstances, we find the prosecutor's mistake to be neither gross nor flagrant.

### *Ill Will*

There is no evidence of ill will on the part of the prosecutor, and Ramirez does not contend that the prosecutor acted out of ill will towards him.

*Prejudice*

Finally, we must consider whether the "'"'""misconduct would likely have little weight in the mind of jurors."'"'" [Citations omitted.]'" *State v. Naputi*, 293 Kan. 55, 58, 260 P.3d 86 (2011) (quoting *State v. Kemble*, 291 Kan. 109, 121-22, 238 P.3d 251 [2010]).

The prosecutor's mistake was contributed to by the trial court's refusal to direct a verdict of acquittal on this charge at the conclusion of the State's case and in changing the PIK instruction so as to predicate Ramirez' liability in instruction No. 10 on the conduct of "another for whose conduct he was criminally responsible" when there was no such other person with respect to this charge.

Ramirez contends that, as a result of the prosecutor's remark, he was denied his constitutional due process right to a fair trial. In cases involving the deprivation of a constitutional right, we will find the error harmless if the party benefitting from the error persuades us beyond a reasonable doubt that the error did not affect the outcome of the trial. *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011). Stated another way, we must determine "whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors." *State v. Bridges*, 297 Kan. 989, Syl. ¶ 15, 306 P.3d 244 (2013).

Here, the State, the beneficiary of the prosecutor's misstatement, makes no claim that these remarks were harmless. No doubt this is because rather than direct and overwhelming evidence of guilt on this charge, there was simply no evidence at all to support it. In closing argument, lawyers explain how the instructions interrelate to one another and how they apply to the evidence produced at trial. Here, the prosecutor's argument on the criminal possession of a firearm charge easily could have left the jurors with the false impression that they need not consider whether Garcia could have been

28

guilty of the crime so as to make Ramirez vicariously liable for it. Thus, we cannot conclude beyond a reasonable doubt that these remarks had no affect on the jury's verdict. Accordingly, while we affirm Ramirez' other convictions, we reverse his conviction for criminal possession of a firearm.

Affirmed in part and reversed in part.