NOT DESIGNATED FOR PUBLICATION

No. 114,860

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KEVIN T. DAVIS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ERIC R. YOST, judge. Opinion filed April 13, 2018. Affirmed.

*Angela M. Davidson*, of Wyatt & Davidson, LLC, of Salina, for appellant, and *Kevin T. Davis*, appellant pro se.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J. PIERRON and LEBEN, JJ.

PER CURIAM: Following a bench trial, Kevin T. Davis was convicted of two counts of aggravated indecent liberties with a child. He was sentenced to two consecutive terms of 25 years to life. Davis appeals, claiming there was insufficient evidence for a finding of guilt beyond a reasonable doubt; the district court did not have jurisdiction due to improper service of the summons; and the district court abused its discretion by not conducting a *Franks* hearing for his challenge to the validity of the probable cause affidavit. We affirm.

1

On July 29, 2011, J.D., who was 13 years old, was arrested for shoplifting and taken to the juvenile intake center. At that time, she resided with her mother (Mother), sister, and Mother's common-law husband, Davis. She filled out a Kansas Youth Needs Screening form, marking "yes" to the question: "Has the youth ever been touched in their private areas that they did not want?" Staff followed up about her response and she identified Davis as the person who had touched her private area. Staff contacted Mother to pick up J.D. and reported the allegations to the Wichita Police Department. Because Mother was taking a test, she sent Davis to pick up J.D.

Officer Robert Schmeidler was dispatched to the center where he was informed that Davis was in the lobby waiting to pick up J.D. Schmeidler's sergeant instructed him to take Davis into custody and transport him to the police department so detectives could interview him. Officer Justin Rapp arrived to assist Schmeidler. Schmeidler told Davis "he was not free to leave, and that he needed to come with me. He needed to come with me and speak with detectives over things that his daughter had told the juvenile intake center." Davis became upset and said, "No" several times before turning and running out the door. Schmeidler pursued Davis on foot. The officers apprehended Davis between 1/2 and 3/4 of a mile from the center.

Detective Virgil Miller interviewed J.D. and attempted to interview Davis. J.D. told Miller that Davis told her he was "showing her stuff" when he touched her; some of it she wanted to know about but some of it she did not. She did not remember when he first touched her, but she knew the last time was not long before the interview. J.D. described two incidents with specificity. Because she could not remember when they occurred, Miller used a type of "hot/cold game" to narrow the date range by using times of the year that children remember. In doing so, J.D. narrowed the date of the first incident to being between Valentine's Day and Easter and the second to being between the 4th of July and a family trip to Memphis.

2

J.D. stated that the first incident occurred after school when Davis asked her if she wanted him to show her something and had her follow him to his and Mother's bedroom. Davis told her to take off her pants and panties and lay on a towel on the floor. He gave her a washcloth to bite if it hurt. He put his hand on her "private part," first rubbing the outside then inserting maybe two fingers into her vagina. She stated that he was trying to open her up. He told her he was going to make her "feel some kind of feeling that shocks [her] whole body," but she could not remember the word for it. When she told him that it hurt, he told her to bite on the washcloth. J.D. could not remember if he stopped because she tried to get up or because somebody opened the front door. Davis kept his pants on and J.D. had never seen or felt his penis. She believed that she would have one day because he told her that he would put his penis in her and he would be "pumping" her. Davis did not forcefully touch J.D., but he promised if she let him show her things he would leave her alone.

The second incident occurred when she was in the bathroom fixing her hair. Davis walked into the bathroom, locked the doors, and rubbed her private part on the outside of her shorts. He left the bathroom, returned again, and he just talked to her. He left and returned a third time. He locked the doors again and put his hand down the front of her waistband into her shorts and panties and rubbed her vaginal area. He commented on her shaving recently and said that he kept coming back because her private part was big. She was not sure what caused him to stop but he just walked out of the bathroom. J.D. estimated that Davis had touched her five times in the time between the two incidents. She had not previously told anyone because Davis had asked her to promise not to tell.

Davis was arrested on July 30, 2011, for two counts of rape. On August 1, 2011, Mother and Davis' mother (Grandmother) took J.D. to the police department to recant her statements. In an interview with Detective Miller, Mother presented an affidavit signed by her and J.D. stating that J.D. had lied to detectives about being sexually abused by Davis because she was afraid of getting in trouble for the shoplifting. Mother stated that

3

J.D. had gone back and forth about whether the allegations were true and told Grandmother that she had lied. Mother was not privy to that conversation and did not know the details. Mother stated that J.D. had told her she lied when they went to the hospital for testing. However, she could not remember exactly what J.D. had said. Mother stated she wrote the affidavit on the recommendation of a couple of attorneys, although she could not remember their names. Miller asked Mother if Davis had been calling her. She admitted that he had to see what was going on and whether J.D. was going to tell the truth.

When Grandmother spoke with Detective Miller, she said she had talked to Davis on the phone at Mother's house and he told her not to worry because everything would be okay. Grandmother stated J.D. had told her she was afraid she had gotten Davis into trouble because she had lied. Grandmother stated that J.D. admitted to her she had lied about Davis touching her and said she never explained what "touch" meant because nobody asked. Grandmother was surprised when Miller told her he had interviewed J.D. for two hours and she had described, in detail, multiple occasions of the touching.

Detective Miller then spoke with J.D. He explained that he still believed what she had said in the first interview. The fact that she had forgotten some details but described others with great detail was consistent with memory recollection, not with making up a story. Miller also told her that it was almost expected for victims to recant allegations. Though J.D. initially stated that she had lied, she ultimately agreed that she just wanted the family to be together and be happy and safe. She believed that because the incidents occurred in the past, she had control over the situation now and Davis would no longer be allowed around her. Miller testified he believed the initial interview because there was a personal connection between him and J.D. during that interview. They were talking to each other. However, in the second interview she was closed off and distracted. She was talking at him instead of with him.

4

As part of the investigation, Detective Miller downloaded 41 jail calls from Davis to Mother. The transcripts of the six calls played in court were admitted as State's Exhibits 3.1 through 3.6.

In State's Exhibits 3.1, Davis told Mother she needed to take J.D. back to the detectives to tell them she was lying because she was afraid that he was going to "whoop" her for the theft.

In State's Exhibit 3.2, Davis told Mother again that all J.D. needed to do was tell them that she was afraid and she had made it up. He asked Mother to wake up J.D. so he could talk to her. When she got on the phone, Davis told J.D. that he was going to go to jail for life and she needed to tell the detectives that he had not touched her. J.D. insisted multiple times that she had not lied despite his telling her that she had. She even countered his story when she told Davis she knew he was not going to whip her. While Davis insisted that J.D. was lying, Mother and Grandmother told J.D. that if she had lied that she needed to tell the truth. J.D. never said she had lied, but she finally agreed to "get it all straightened out."

In State's Exhibit 3.3, Davis told Mother that if J.D. had to testify at the preliminary hearing, she needed to say that she lied because she was afraid he was going to whoop her. He again instructed Mother to take J.D. to the police department to tell the detectives she had lied. In State's Exhibit 3.4, Mother and Davis discussed preparation of the affidavit and Mother typed the form while Davis provided instructions. In State's Exhibit 3.5, Mother told Davis that they had taken the affidavit to the detective but he was still going to press charges because he believed J.D.'s initial disclosure.

In the State's Exhibit 3.6, Mother's tone changed when she confronted Davis about details that J.D. had disclosed. J.D. had told Mother that Davis had used Astro Glide lubricant during the incident on the bedroom floor. Mother did not believe that J.D.

5

would have any reason to know what Astro Glide was. Further, J.D. told her that Davis had said, "Let me do it," which he had said to Mother when they were intimate.

Davis was released without prosecution (WOP) on August 3, 2011. WOP meant the State had not filed charges prior to him being released from jail. The State regularly released cases as WOP when further investigation was necessary before charges could be filed.

On March 9, 2012, the State filed a complaint charging Davis with one count of aggravated indecent liberties with a child for the incident that occurred in July 2011. A summons was issued and mailed to Davis' address at the time of his arrest in July 2011. On April 3, 2012, the summons was returned unclaimed. An arrest warrant was issued May 7, 2012. Davis became aware of the warrant and hired an attorney. Trusting that the warrant had been taken care of, Davis went to work in the state of Oregon. He also called the State to discuss the warrant. Because the State was unable to verify the caller, it advised him to talk to his attorney. Davis was later arrested in Oregon and subsequently convicted of unlawful possession of marijuana, unlawful manufacture of marijuana, and felon in possession of a firearm in March 2014. He was then extradited to Kansas where he opted to proceed to trial pro se with standby counsel.

Davis filed more than 50 pro se motions, two of which are at issue in this appeal.

Davis filed a motion to dismiss for improper service of summons on July 24, 2014. The motion was heard on August 1, 2014. Davis contended he was released without prejudice from jail in August 2011 and the summons was sent to the address of a woman he had dated, not an address where he had ever resided. The State provided that contrary to Davis's statement, the evidence at the preliminary hearing showed that the woman was Mother, his former common-law wife with whom he had lived for several years at that address. The district court pointed out that there was no requirement for a summons and

that most cases like his went straight to a warrant. Further, dismissal is the most severe sanction by the court and, while the State should have tried to send the summons to the correct address, it was not grounds for dismissal in this matter. The district court denied the motion. Davis objected.

Davis also filed a motion to suppress evidence pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), on January 29, 2015. The motion was heard on February 2, 2015. Davis alleged that Detective Miller included material statements provided by J.D. with reckless disregard for the truth of her statements. The State contended that by the time the motion was heard, the validity of the affidavit was no longer an issue because the district court had found that probable cause existed at the preliminary hearing. The district court denied the motion. Davis objected.

Davis represented himself in a 4-day bench trial beginning February 3, 2015. The district court rendered a verdict on February 9, 2015. The court stated it had considered the evidence admitted at trial from eyewitnesses and had observed their demeanor on the stand as well as the exhibits admitted. The court found that the two contested elements of both counts were the date and whether the lewd fondling or touching was done with the intent to satisfy the sexual desires of the defendant, the victim, or both. Having watched the video of the interviews in court, the district court did not see anything inappropriate about how Detective Miller arrived at the time frame and J.D. had testified she believed the incidents occurred between those dates. The court found that the dates, "as prompted by the detective and agreed to by [J.D.], were appropriately done." With regard to whether the intent was to satisfy sexual desires, the court stated that "there is more evidence frankly than unusual [sic] to support that. And that it can be inferred from the circumstances that that occurred." Though the transcript uses the word "unusual," it appears that the court misspoke or there is an error in the transcript. From the context of the sentence, it seems the court may have been trying to say "more evidence than usual" or that it was an unusual amount of evidence to support that element.

7

The district court found Davis guilty of both counts beyond a reasonable doubt.

Davis was sentenced on July 8, 2015. The State recommended the standard sentence of 25 years to life for each count, to run consecutively. The State noted that the standard sentence was appropriate because the relationship made J.D. particularly vulnerable and the sexual abuse occurred over a period of time. Davis asserted that 25 to life was not appropriate as the verdict was made on insufficient evidence and again claimed that the allegations were made up so that J.D. would not get in trouble for stealing. The district court found there were no substantial or compelling reasons to grant a durational or dispositional departure and sentenced Davis to two consecutive terms of 25 years to life.

Davis was appointed appellate defense counsel and counsel has appealed Davis' convictions for sufficiency of the evidence. Davis has submitted a pro se brief challenging the district court's denial of his motion to dismiss due to improper service and his motion requesting a *Franks* hearing.

Davis first argues there was insufficient evidence to support his convictions for two counts of aggravated indecent liberties with a child.

When the sufficiency of the evidence is challenged in a criminal case, "[a]fter reviewing all the evidence in a light most favorable to the prosecution, the appellate court must be convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014). Circumstantial evidence is sufficient for conviction as long as it provides a reasonable basis from which the fact-finder may reasonably infer each element. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). "It is only in rare cases

8

in which trial testimony is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Ramirez*, 50 Kan. App. 2d 922, 936, 334 P.3d 324 (2014). See *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983); *State v. Naramore*, 25 Kan. App. 2d 302, 313-14, 965 P.2d 211 (1998).

Appellant counsel claims that a rational fact-finder could not find Davis guilty beyond a reasonable doubt because the only evidence of the offense was J.D.'s testimony. J.D. admittedly did not like Davis, she changed her story, and she was trying to get out of trouble after being arrested. Counsel contends that J.D.'s affidavit was not the only evidence that she fabricated the story. She also admitted to Mother that she had lied. Further, although the State implied that J.D. was coerced into recanting, evidence suggested J.D. was just as likely coerced by the State to maintain the story of abuse by arresting Mother and placing J.D. and her sister into police protective custody.

The district court made the determination of guilt beyond a reasonable doubt after considering the testimony and the demeanor of witnesses as well as the videos, audio recordings, and transcripts of both that were admitted into evidence. J.D. never denied that she changed her story after the initial disclosure, and there are two interviews with seemingly opposing versions of events. However, both videos were played during the trial as were four jail calls from Davis that occurred between the two interviews and two that occurred after the second interview.

In determining that there were only two elements in question for each incident, the district court made credibility determinations based on the evidence and determined that lewd fondling or touching had occurred in Sedgwick County. There had been no dispute on whether the sexual abuse alleged occurred in Sedgwick County. Both described incidents occurred in the family home in Wichita. However, Davis disputed that the lewd fondling or touching occurred and claimed that J.D. was not credible. However, the court listened to the recorded interviews and paid attention to J.D's demeanor as she testified.

9

We cannot reevaluate the district court's credibility determination. In addition to J.D.'s testimony, Detective Miller testified that based on his experience, training, and observations, he believed the sexual abuse had occurred. The circumstantial evidence provided a reasonable basis from which a fact-finder could reasonably infer that the element of lewd fondling or touching occurred. See *Logsdon*, 304 Kan. at 25.

The district court determined that Det. Miller's method for narrowing the time frames for the incidents was reliable. Miller described it as a hot/cold game in which he used significant dates to narrow the date range in which the incidents occurred. Miller did not suggest times in which the incidents occurred, but he provided holidays or school activities and asked J.D. if the incident occurred before or after that date and continued until the range was sufficiently narrowed. Miller further testified that he has specialized training in forensic interviewing in which the interviews are designed to be nonleading. He even explained to Mother that he used specific interviewing techniques to gauge the truthfulness of J.D.'s initial interview by her ability to recall details without having to go back through the entire story.

The district court further found there was more evidence than usual that the intent of the touching was to satisfy the sexual desires of either J.D., Davis, or both. J.D. stated that she had never seen Davis's penis and had never seen if he had been aroused during the incidents. She also testified that he never satisfied her sexual desires. However, the crime only requires an intent to satisfy sexual desires. Davis told J.D. that he was trying to make her feel something that would shock her whole body. Also, when asked what Davis was doing with his fingers inside her vagina, J.D. answered that she thought he was trying to "open the hole up some more" and later stated that he had told her that one day he would put his penis in her.

Considering the credibility determinations and the rationale provided by the district court, when viewing the evidence in the light most favorable to the prosecution, a

10

rational fact-finder could reasonably find sufficient evidence for guilt beyond a reasonable doubt.

Davis next argues the district court did not have jurisdiction to convict him.

Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *State v. Smith*, 304 Kan. 916, 919, 377 P.3d 414 (2016). District courts have exclusive jurisdiction to try all felony cases arising under the laws of the state of Kansas, except as provided in K.S.A. 2017 Supp. 12-4104. K.S.A. 22-2601. Prosecution for such cases is to occur in the county in which the crime was committed. K.S.A. 22-2602. Prosecution of criminal cases begins by the State filing a complaint with the magistrate. K.S.A. 22-2301.

Davis contends the district court did not have jurisdiction to proceed with the case because he was improperly served with the summons. He cites to K.S.A. 60-212(b)(5), in which insufficient service of process is a defense under Kansas civil procedure. However, criminal procedure statutes do not follow the same service requirements.

Under K.S.A. 2017 Supp. 22-2302(a), the prosecution provides the magistrate with a probable cause affidavit and if the magistrate finds probable cause that a defendant committed a crime, a warrant is issued. However, in a felony case, such as this, upon request by the prosecutor, a summons may be issued in place of a warrant. K.S.A. 2017 Supp. 22-2302(a). Under K.S.A. 22-2305(4), a summons may be served to the defendant personally, by leaving it at his or her dwelling house or place of abode, or by mailing it to his or her last known address. If the defendant fails to appear in response to the summons, a warrant shall be issued. K.S.A. 2017 Supp. 22-2302(a). There is no statutory requirement for proper service of a summons prior to issuing a warrant for failure to appear. The purpose of both a summons and a warrant is to provide the defendant with actual notice of the charges against him or her and ensure that he or she appears before

11

the court for further proceedings. *State v. Overton*, 279 Kan. 547, 551, 112 P.3d 244 (2005).

Here, the State attempted to properly serve the summons by mailing it to Davis at the address where he had lived with Mother and her children for approximately five years. The summons was returned unclaimed on April 3, 2012. Because service failed, the summons failed to serve its purpose and issuing a warrant was the only way to ensure that Davis would receive actual notice of the proceedings. A warrant, once issued, goes into a national registry and when Davis had police contact, the warrant showed up when the police ran his name, which is why Oregon held him for extradition.

When a summons is issued in a felony case, it is as a courtesy—not a requirement—to the defendant for jurisdiction. Jurisdiction is obtained when a violation of a Kansas statute is committed in the county in which the district court sits. Improper service of a summons has no bearing on jurisdiction of a criminal case. The statutes provided by Davis are all civil procedure statutes, which are not applicable here. The district court had jurisdiction of Davis.

Davis finally argues that the district court erred by not conducting a *Franks* hearing for his challenge to the validity of the probable cause affidavit.

Arrest affidavits are generally presumed to be valid, and to challenge the validity, the attack must be supported by allegations and offer proof under oath that the affidavit contains material statements of deliberate falsehood or reckless disregard for the truth. *State v. Breazeale*, 238 Kan. 714, 725, 714 P.2d 1356 (1986). Generally, when reviewing a *Franks* determination, we apply a bifurcated standard in which the district court's findings are reviewed to determine if they are supported by substantial competent evidence but the legal conclusion regarding the suppression of evidence is reviewed de novo. *State v. Adams*, 294 Kan. 171, 179-80, 273 P.3d 718 (2012).

12

However, like in *Adams*, the district court here did not conduct an evidentiary hearing or make factual findings necessary for the typical *Franks* analysis. Instead, we will review whether the affidavit provided a substantial basis for the magistrate's determination that there was a fair probability that Davis had committed the alleged crime. 294 Kan. at 180 (citing *State v. Hicks*, 282 Kan. 599, Syl. ¶ 2, 147 P.3d 1076 [2006]). Though the *Franks* hearing initially only applied to search warrants, the Kansas Supreme Court expanded the *Franks* standard to arrest warrant affidavits as well. See *Breazeale*, 238 Kan. at 725.

On January 29, 2015, Davis filed a motion to suppress based on *Franks.* The motion was heard on February 2, 2015. The motion was denied because it was filed after the preliminary hearing, which occurred on July 10 and 18, 2014, during which the district court found there was probable cause to believe Davis had committed the alleged crimes.

A defendant must show that the affidavit was unreliable as it (1) contained statements that were material to the probable cause finding and (2) the material statements were either a deliberate falsehood, made in reckless disregard for the truth, or the affiant deliberately omitted a material fact. *Adams*, 294 Kan. at 179. In challenging the affidavit, the defendant must point out specifically what information in the affidavit he claimed is false. If a defendant makes a prima facie showing that the affidavit is questionable, the district court first determines if, without the questionable statements, probable cause exists. If probable cause exists without the challenged portions of the affidavit, no hearing is warranted. However, if probable cause does not exist without the challenged statements, the defendant is entitled to an evidentiary hearing. 294 Kan. at 179.

Davis claimed that Detective Miller recklessly disregarded the truth by accepting J.D.'s disclosure as true despite her arrest for theft and Miller did not have parental consent before interviewing her. Davis filed the motion to obtain a warrant for perjury or based on reckless disregard to have the false statements set aside and, therefore, the remaining statements would be insufficient for probable cause. Davis claimed that he submitted the motion months prior to the January 2015 filing date. Davis did not provide a previous filing date. He wrote a letter to the clerk of the district court on May 12, 2014, regarding motions being filed but not scheduled; however, there is no indication that any motions were submitted but not filed.

Davis did not specify which portions of the affidavit were false or reference any information actually included in the affidavit. He, therefore, failed to make a sufficient *Franks* showing of deliberate or reckless acts by Detective Miller. In challenging all statements by J.D., the motion appeared to be an attempt to argue the merits of the case before trial rather than to challenge the validity of the affidavit. Further, the remedy sought is for all facts in the affidavit to be set aside, which would have led to a dismissal of the case. As argued by the State, the motion was filed after the preliminary hearing. After live testimony and evidence presented at the preliminary hearing, the district court determined that probable cause existed to believe that Davis committed the alleged crimes.

Further, a *Franks* hearing is to determine whether the affiant participated in wrongdoing in order to obtain a warrant, not whether the information provided to the affiant was false. The purpose is to ensure that affiants do not manipulate the magistrate by providing skewed facts to obtain a warrant. Here, Detective Miller included a factual statement that included the information provided in police reports, interviews, and jail phone calls. He even included the affidavit to recant the allegations and J.D.'s theft arrest. Miller did not include material statements with reckless disregard for the truth as he included all information, even information that would discredit J.D., to provide the

14

magistrate with a full picture of the case in determining whether probable cause for the arrest warrant existed.

Because Davis did not challenge any particular information contained in the affidavit, let alone specific portions of the affidavit, he failed in making a sufficient *Franks* challenge. Even if he had properly challenged the veracity of the information in the affidavit, the challenge would fail because the affidavit provides information for and against J.D.'s credibility and the challenge was filed after Davis was bound over on the charges after the preliminary hearing. The district court did not err in denying Davis' motion for a *Franks* hearing.

Affirmed.